CHERTKOF, Trustee in the Trust Estate of David
W. Chertkof et al. *v.* SPECTOR BALTI-
MORE TERMINAL, INC.

[No. 75, September Term, 1971.]

*Decided December 7, 1971.*

The cause was argued before HAMMOND, C. J., and BARNES, McWILLIAMS, FINAN, SINGLEY, SMITH and DIGGES, JJ.

*W. Hamilton Whiteford,* with whom were *B. Ford Davis* and *Whiteford, Taylor, Preston, Trimble & Johnston* on the brief, for appellants.

*Neil Tabor,* with whom was *S. Leonard Rottman* on the brief, for appellee.

SINGLEY, J., delivered the opinion of the Court.

Nearly 20 years ago, the late David W. Chertkof, a Baltimore commercial and industrial real estate developer, purchased a tract in excess of 120 acres, lying generally north of the right of way of the Penn Central Railroad at the eastern boundary of Baltimore. Chertkof proposed to develop this property as an industrial park and, in furtherance of this plan, ensuing conveyances of parts of the tract by Chertkof-controlled corporations contained substantially similar restrictive covenants. This case commenced as an equity suit brought by two of David W. Chertkof's successors in title, referred to collectively as Chertkof, in the Circuit Court for Baltimore County, to enforce certain of the covenants against

the owner of one of the tracts. From a decree dismissing the bill of complaint this appeal was taken.

On 20 July 1967, Spector Freight System, Inc. (Spector), a Chicago-based trucking company, purchased from Perma Products Corporation (Perma), a Chertkof-dominated corporation, a 7.26 acre lot, on which Spector proposed to erect a truck terminal.[1] Both the contract and the deed of 18 September 1967, by which the tract was conveyed to Spector, contained five restrictive covenants, of which only three were at issue below:

"1. No structure of any kind shall be erected, laid out or built at any time on the lot of ground herein conveyed until the detailed plans and specifications therefor, including the location and plot plan of all structures and roads and paved areas, shall have been approved in writing by the Grantor, its successors and assigns. In passing on such proposed use, the material to be used, size and design, the setback and sideline areas, the outlook and effect on adjoining property and design to accomplish freedom from hazards, congestion and nuisance, [sic] giving due consideration to the industrial nature of proposed area. Brick or brick veneer shall be required in all events on the Quad Avenue facade of the building. It is expressly agreed that after the completion of the initial construction of any building, the Grantee, its successors or assigns shall not be required to obtain approval from the Grantor, its successors or assigns for any extensions, enlargements, replacements or modifications of or to the original building or to any new building (including a shop building) thereafter erected on the site, pro-

---

1. Title was taken by Spector Baltimore Terminal, Inc., a Maryland corporation. "Spector" is used in this opinion to refer to both the parent and the subsidiary.

vided same shall be comparable in design and appearance with the original building."

* * *

"2. No building or structure may be erected, and no materials may be stored excepting during the period of construction of a permanent building, nearer to Quad Avenue than a setback line drawn parallel therewith and seventy-five (75) feet therefrom. The area between the seventy-five (75) feet setback line and a line drawn parallel with and twenty-five (25) feet from Quad Avenue may contain, however, driveway and parking and loading areas."

* * *

"4. No building or structure may be erected and no materials may be stored nearer than twenty-five (25) feet from either side of the property. Such areas may contain, however, driveway and parking and loading areas."

The contract also contained an integration clause providing that the contract contained "the final and entire agreement between the parties * * * and neither they nor their agents shall be bound by any terms, conditions or representations not herein written * * *."

James F. Sneberger, vice president of Spector, was permitted to testify over Chertkof's objection that Howard Chertkof, secretary and a director of Perma, who figured largely in the negotiations as an officer of Perma, a corporation controlled by David, his grandfather, was insistent that the restrictions be incorporated in the deed, because the owners were endeavoring to keep the restrictions uniform throughout the development. Spector, on the other hand, felt it could not "live with" the restrictions and wanted Perma to get more "specific."

The impasse over restrictive covenants was broken by a letter which Chertkof's counsel wrote to Spector's house counsel on 28 June. The letter said:

"In my other letter to you of this date regarding the Quad Avenue project, I neglected to state that (in view of the desire to have the recorded land development restrictions appear uniform of record, and I have for that reason reverted to the restrictions which were set forth in my original contract draft) the Seller will give you a letter now that it approves the construction on the described land of the proposed Building possessing the features which you enumerated as "a." through "d." in II, A on page two of your contract draft and in that same letter will approve the installation of the ground level scales and underground fuel tanks, as you described those in "(4)." of II. A." on page three of that draft.[2]

---

2. The draft of the contract of purchase and sale suggested by Spector contained the following provisions in Sections II. A. (1). and II. A. (4).:

"II. A. Good and merchantable title to the premises, free and clear of all liens, claims and encumbrances of every kind and nature whatsoever shall be conveyed by the Seller to the Buyer or the Buyer's nominee, as Buyer shall direct in writing, by Stamped Warranty Deed, subject only to general real estate taxes for the year 1967 and subsequent years provided, however, the following provisions and restrictions shall be included in said deed and shall run with and bind the land and inure to the benefit and be enforceable by either party, its successors and assigns in title, and the failure by either party, its successors or assigns in title, to enforce any restriction, condition, covenant or agreement herein contained shall in no event be deemed a waiver of the right to do so thereafter as to the same or any breach or as to the one occurring prior to or subsequent thereto:

(1). No structure of any kind shall be erected, laid out or built at any time on the premises herein conveyed unless said structure shall include the following features:

a. Roofs will be flat.

b. Portion of structure fronting on Quad Avenue will be brick or brick veneer.

c. All structures will be constructed in accordance with existing local building codes and ordinances.

d. Columns on the dock of structure which sup-

"With this explanation you will understand the occasion for my revision of that part of the contract."

Accordingly, Spector did not sign Chertkof's form of purchase contract until it received a letter dated 11 July 1967 from Perma's counsel, countersigned by Perma, which after revision on 13 July, read in part:

"As by my letter of June 28, 1967 to you, * * * this letter, executed also below in behalf of Perma Products Corporation, advises you that Perma approves for construction on the site * * * with the following characteristics, freight terminal building with office space of not less than 2400 square feet and dock space of not less than 12000 square feet such building to be essentially centrally located on the land site: (a) Roofs will be flat, (b) Columns on the dock of structure which support the walls will be of steel or 'painted concrete', (c) Ground level scales and underground fuel tanks, with necessary underground equipment attached thereto, may be installed nearer than 25 feet from either side of the property. * * *" [3]

On the same day that the contract was signed, Spector entered into a sale and lease-back agreement with 7100 Quad, Inc., a corporation owned by Howard Chertkof, under which 7100 Quad had the option of purchasing the property upon completion of the improvements from Spector at an amount equivalent to Spector's total

---

port the roof and the walls will be of steel or 'painted concrete'.
* * *
(4). No building or structure may be erected and no materials may be stored, except ground level scales and underground fuel tanks nearer than twenty-five (25) feet from either side of the property. Such areas may contain, however, driveway and parking and loading areas."

[3] These letters were signed in behalf of Perma by Howard Chertkof.

cost and leasing the property to Spector for a term of 22 ½ years at an annual "net-net" rent which was fixed at 9.13% of Spector's cost, later determined to be about $519,000. Paragraph 3 of the sale and lease-back agreement provided:

> "3. That upon acquisition of title to said tract by the said nominee corporation [Spector Baltimore Terminal, Inc.], Spector shall cause said nominee corporation to build, erect, construct and complete thereon, with proper diligence and in a good and workmanlike manner, and with all reasonable speed as possible, and in accordance with all existing building codes, regulations and ordinances of the Baltimore County, a complete and ready to operate truck terminal facility, said completed terminal building to be of brick masonry and/or concrete with open web steel joist roof supports, a metal dock, and a bonded tar and gravel roof, and further provided that said structures shall include the following features:
>
>     a). Roof will be flat.
>     b). Portion of structure fronting on Quad Avenue will be brick or brick veneer.
>     c). Columns on dock structure will support the roof and walls will be of steel or painted concrete."

What happened was that Spector, at Perma's insistence, submitted plans and specifications after construction had been commenced, which Sneberger assumed were to be used by 7100 Quad, Inc., in connection with financing the sale and lease-back. Perma demanded a modification of the plans, which Spector refused, relying on its having received approval prior to entering into the contract. As soon as the building was complete, Perma sought to enforce the restrictive covenants and require the modifications it desired. When it was determined that Perma no longer held title, a similar action was brought

by the present appellants, two of the owners of property in the area.

The violations alleged in the bill of complaint were (i) Spector's failure to obtain written approval of detailed plans and specifications, with the consequence that the elevation of the floor and roof of the terminal is too low; (ii) a front 75 foot setback line was encroached upon by the weighing platform and superstructure of a scale; (iii) a side 25 foot setback line was violated by the erection of a fence, light standards, I beam bumpers, truck warmers and the parking of tractors and trailers.

While the parties raise other contentions, both sides are aware that the critical issue in the case is the admissibility vel non of Sneberger's testimony and Perma's letters of 11 and 13 July 1967.

Chertkof argues that both the parol evidence rule and the integration clause of the contract of purchase and sale make the testimony and letters inadmissible, relying principally on *Pumphrey v. Kehoe,* 261 Md. 496, 276 A. 2d 194 (1971) and *Markoff v. Kreiner,* 180 Md. 150, 23 A. 2d 19 (1941), which are authority for the proposition that parol evidence is inadmissible to vary or contradict the terms of a written instrument, particularly where the contract is one for the sale of land, or contains an integration clause. Spector, on the other hand, points out that we have, in a long line of cases culminating in *Shoreham v. Randolph Hills,* 248 Md. 267, 235 A. 2d 735 (1967), recognized that an integration clause is not invariably conclusive, and that its reach may well be a matter of interpretation. In that case, we read together two contracts entered into with different parties by Shoreham Developers, Inc.

Spector says, and we are inclined to agree, that Perma's letters met the three-fold test set out in *Rinaudo v. Bloom,* 209 Md. 1, 120 A. 2d 184 (1956) by which the existence of a collateral agreement is determined:

> "Under this test it is necessary (1) that the agreement be independent, separate and dis-

tinct from the original agreement, (2) that it be consistent with the provisions of that contract and (3) that it be such an agreement as the parties could not reasonably be expected to embody in the main contract and would naturally make a separate agreement. The first and third of these requirements tend to shade into each other." 209 Md. at 9, 10.

It seems to us, as it did to the chancellor, that on the facts, we have a classic case of a collateral agreement which was admissible despite the parol evidence rule and the integration clause and that testimony regarding the circumstances which gave rise to the letters was similarly admissible. Perma, for reasons of its own, wanted to preserve the *apparent* uniformity of the recorded restrictions. Spector, knowing full well that the best of truck terminals is hardly likely to be an aesthetic triumph, wanted to guard against the possibility that its use of a tract for which it was about to pay approximately $159,000 could be dictated by the desires or whims of another.

The Rinaudo tests fit like a glove. The terms of the letter could not be incorporated in the contract if Perma's purposes were to be served, yet there had to be such a letter if Spector's demands were to be met. As for the consistency test, it matters little whether we regard it as a submission and approval of design which preceded the contract, or an undertaking by Perma to approve at a later date any plans and specifications which met the conditions incorporated in Perma's letter.

It will be remembered that the other violations which Chertkof alleged in his bill of complaint related to a scale which encroached on the front 75 foot setback line and the use of the side 25 foot setback, where a fence, light standards, I beams (four and one-half feet high), bumpers (apparently made of formed macadam) and truck motor warmers had been placed, for the parking of trucks.

The first complaint was readily disposed of when the chancellor found that the scale and scale house were more than 75 feet from Quad Avenue, although a portion of the scale pad extended into the setback area where it lay in the driveway, a fraction of an inch from the grade of the driveway. He concluded that this was a part of a driveway which the restriction specifically permitted in the setback area, which we cannot regard as clearly erroneous, Maryland Rule 886. It would seem that Chertkof has abandoned this point on appeal.

Restrictive covenant 4 prohibited the erection of buildings and structures and the storage of materials within 25 feet of the side lot line and continued, "[s]uch areas may contain, however, driveway and parking and loading areas." Spector contended, *inter alia*, that the fence and the light standards are clearly not structures within the meaning of the paragraph and are customarily placed at truck terminals for reasons of security. Jack Chertkof, himself an engineer, and vice president and a director of Perma, conceded that truck terminals were ordinarily fenced.

With regard to the I beams, macadam bumpers and motor warmers, it would seem that these are clearly ancillary to parking and loading, which are permitted uses. The bumpers are intended to promote orderly parking and to protect the fence; the I beams make motor warmers possible. The "motor warmer" is deceptively named, conjuring up visions of some sort of heating apparatus, which it is not. In actuality, it is a weatherproof electric receptacle mounted on each I beam, into which a plug can be inserted, thus activating a heating element (the "warmer") which is installed in the crankcase of a truck or tractor. It seems to us no more of a structure than a light standard, and a necessary adjunct to a place where trucks are to be parked.

We are satisfied that the result reached below should be upheld.

*Decree affirmed, costs to be paid by appellants.*