A.P. LEONARDS and Pamela Leonards, his wife, Plaintiffs–Respondents,

v.

U–JIN ENTERPRISES, INC. and Jung Wang, Defendants–Appellants.

No. 17130.

Missouri Court of Appeals, Southern District, Division One.

June 26, 1991.

---

5. *See* Notes on Use paragraph 7, MAI CR 3d 325.04 for comment on "burden of persuasion" as it relates to § 195.180.

Robert W. Evenson, Evenson, Carlin & LePage, Pineville, for plaintiffs-respondents.

Abe R. Paul, Rhoades, Paul and Paul, Pineville, for defendants-appellants.

PREWITT, Judge.

Plaintiffs and defendants each claim the others breached a real property lease. Following nonjury trial defendants appeal from judgment awarding plaintiffs $165,-724.12 and denying defendants' counterclaim. Each of defendants' "Points Relied On" are based on assertions that plaintiffs failed to properly construct fencing required in the lease or thereafter to repair it.

Review is under Rule 73.01(c). As that rule is interpreted, this court is to sustain the judgment unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law. *Thomas v. Depaoli*, 778 S.W.2d 745, 747 (Mo.App.1989). Due regard is given to the opportunity of the trial judge to determine the credibility of witnesses. Rule 73.-01(c)(2). The trial judge can disbelieve testimony even when uncontradicted. *Robinson v. Estate of Robinson*, 768 S.W.2d 676, 677 (Mo.App.1989).

**482**

Plaintiffs reside in the state of Louisiana. Defendant U–Jin Enterprises, Inc. is a California corporation with its principal place of business in San Francisco. Defendant Jung Wang is a California resident.

The lease was signed by defendants on January 8, 1985, and plaintiffs on February 5, 1985. Under it defendants were to lease 1,740 acres plaintiffs owned in McDonald County. The property had previously been used as a cattle farm or ranch. Defendants were to use the premises as an elk ranch. Rental was $10 per month per elk, but no less than $5,000 per month. Defendants operated elk ranches in two other states. Profits from elk are derived by tranquilizing and removing antlers from the male in the spring. The antlers are then frozen and sold in the Orient for medicinal purposes.

Bud Williams, a ranch manager for defendants, inspected the premises and started negotiations on the lease with plaintiffs. The lease was the result of drafting by the parties and their attorneys. The lease required that plaintiffs construct a fence around the premises "at least eight (8') feet tall with hog wire (or better) with squares [sic] approximately 2″ × 3″ and is to be constructed in such a manner that it is reasonably anticipated that the same will not be damaged by the elk."[1] The lease further stated:

> That the Lessee [defendants] covenants that it will maintain the fences in as good a condition as when received excepting normal wear and tear and acts of God and that it shall make all repairs needed on the fences with Lessors [plaintiffs] providing the materials and equipment and Lessee providing the labor.

Plaintiffs were to give Lessee notice when the fencing was completed and rental payments were to begin thirty days after the notice was given or when the property was occupied by the defendants, whichever occurred first. Plaintiffs agreed that they would have sufficient fence completed prior to March 1, 1985, to allow plaintiffs to move their elk herd to the property. The parties knew that all the fencing could not be completed by then.

Most of the vertical portion of the fence constructed by plaintiffs is commonly known as "chain link" and the fence was so described in the evidence. The fence was of steel posts, corner posts and braces. The chain link portion was seven feet high and there were two strands of barbwire above it. At the top part of the fence was a galvanized cable approximately the size of a little finger. This same type of cable was stretched through the center and on the bottom of the fence. Plaintiff A.P. Leonards described it as a "hurricane fence".

In constructing the fence several hollows, some apparently fairly large, were filled in with rock and debris to level the land so that a vehicle could be driven around the premises to check the fence. The fence was constructed over the fill. The lease did not provide how the hollows would be fenced and it was not discussed by the parties, at least until fencing commenced. Plaintiffs were not required to construct the fence so that it could be driven around it. The perimeter fence was completed in August of 1985. It was 7.4337 miles long. Plaintiffs' total fencing cost was in excess of $510,000.

In March of 1985 when the first elk arrived, there were 200 acres on the north part of the ranch which were fenced. By June of 1985 there were 1171 elk on the premises. Bud Williams arrived to manage the ranch about two weeks before the elk started to arrive. Williams testified that elk are a very excitable animal subject to stress and the fencing crew from Texas would drive through and around the animals and panic them. There were two fencing crews, the other from Missouri. Under the lease defendants were to construct the corrals used to pin up the male elk while harvesting their antlers and there was evidence that these were not constructed in 1985 in time to do so.

1. The reference to "hog wire" apparently refers to "woven wire" fencing commonly used to contain hogs. Woven wire was not used in the fencing.

In the spring of 1986 heavy rainfall caused washouts where some of the hollows had been filled, allowing according to undisputed testimony presented by defendants, between 500 and 700 elk to escape. Defendants spent $4,850 to hire helicopters to search for them. Between 75 and 100 were never recaptured and defendants placed their value at $127,500.

There were three or four areas where washouts "of some consequences" occurred. One was as large as 40 feet wide and 15 feet deep. The elk escaped through that washout. Defendants repaired the washouts but contend they would reoccur unless substantial changes beneath the fence were made. They assert this was plaintiffs' obligation which they failed to meet.

Defendants paid rent through December of 1986. In January of 1987, defendants started to move their elk and vacated the property in March or April of 1987. They claim it was necessary to move the elk because plaintiff did not repair the washout areas beneath the fence. Plaintiff A.P. Leonards testified that he agreed to pay for materials to repair the washouts if defendants paid the labor cost.

Although there was testimony that Williams "criticized" the filling of hollows in constructing the fence, it was disputed whether he complained that it was not satisfactory because the filled in portions would be subject to washing out by heavy rains allowing the elk to escape. Williams' testimony indicated he did. Plaintiff A.P. Leonards said he did not, that they discussed "washouts" and knew filling was not "ideal", but due to the number of elk there and the need to complete the fence, they went ahead in that manner.

Williams testified that when the fence was completed it was "excellent" except "where they made the fills across the canyons". He said the problem was not the fence, but constructing the fence on ground that would wash out. He testified elk were different than other livestock as they loved water and would escape through it before it went down. Because of this, the possibility of washouts beneath or of a fence had to be checked sooner.

For defendants' first point they state the trial court erred by its findings of fact 16, 35 and 38 and by its conclusions of law 7 and 9 as "there was substantial, competent and unrebutted evidence that the flood damage to the perimeter fence required a substantial structural repair, that as a result, the duty to repair was that of the respondent [plaintiffs] and that respondent's failure to repair constituted a constructive eviction terminating appellant's duties and obligations under the terms of the lease." The findings of fact and conclusions of law referred to in the point are set forth below.[2]

2.                    FINDINGS OF FACT

16. That the construction and suitability of the perimeter fence and cross fences, which were installed by Plaintiffs, were approved by Defendants' agent, Bud Williams.

35. That at all times herein, the Defendants had superior knowledge of the amount of seed and fertilizer needed for pastures, considering the numbers of Elk Defendants had on the ranch and where they were expected to graze.

38. Plaintiff provided Defendants with concrete slabs and other materials for the purpose of repairing the fence and washouts in the fence.

CONCLUSIONS OF LAW

7. The entire perimeter fence, under the circumstances, was completed within a reasonable time, as required by paragraph four (4) of the Lease. Defendants' authorized agent, Bud Williams, provided input in the decisions made in the construction of the fence, and approved as to the quality and sufficiency of the fence, including the water gaps in the low areas of the fence, which were later washed out by heavy rains. Defendants undertook to perform and pay rent, and waived any objections to the sufficiency of the fence by that conduct and by the acquiescence and participation of Bud Williams in the construction thereof.

9. The Defendants had the duty, under paragraph six (6) of the Lease, to maintain all fences in as good a condition as when received, excepting normal wear and tear and acts of God; they had the duty to make all repairs needed on the fences, with Plaintiffs to provide the materials and equipment, and Defendants providing the labor. Defendants also had a duty to provide all normal ranch care on the premises, under paragraph eight (8) of the Lease. Plaintiffs only duty, under the Lease with regard to these provisions, was in fact to pay for the materials and equipment needed.

The Defendants assert that Plaintiffs failed to repair the water gap and wash-outs on the pe-

Defendants' second point is the trial court erred in its findings of fact 16 and conclusions of law 7 that Bud Williams approved the sufficiency or quality of the perimeter fence or waived objections to it "by his acquiescence and participation in its construction in that there was no substantial or competent evidence to support its findings and conclusions" and that it was plaintiffs' "duty to repair the structural damage and Leonards failed to raise the issue of waiver and acceptance by pleading it as an affirmative defense." Findings of fact 16 and conclusions of law 7 are in footnote 2.

For their remaining point defendants contend that the trial court erred in declaring and applying the law by its findings of fact 6, 31, 32 and 53 and by conclusions of law 2, 3 and 4 "in that there was substantial, competent and unrebutted evidence that the respondent breached the lease agreement by denying appellant exclusive and peaceful possession of the leasehold and that the elk lost by Wang in the spring flood of 1986 was due to the structural defects in respondents' perimeter fence." Those findings and conclusions are set forth below.[3]

As can be seen from the points, the case turns on whether plaintiffs breached the lease by not properly constructing a fence, or defendants acquiesced in the fence as built, and who had the duty to repair after the damage caused by heavy rains in 1986.

■ Although there was no reference in the lease to "structural repairs" defendants rely on the principle that a tenant cannot be held to make "substantial structural repairs unless it so specifically agrees in the lease." See *Mobil Oil Credit Corp. v. DST Realty, Inc.*, 689 S.W.2d 658, 661 (Mo.App.1985). A promise by a tenant to keep the property in repair, unless the language clearly appears otherwise, does not obligate the tenant to make repairs other than those that are the result of ordinary wear and tear on the property. *Id.*

■ "Structural defects" are said to be an integral part of the structure or something which immediately supports it. *Schulze v. C & H Builders*, 761 S.W.2d 219, 222–223 (Mo.App.1988). An improvement may be structural even if it does not support a structure but is necessary to its use, such as floors. *Id.* at 223. See also *San Luis Trails Ass'n v. E.M. Harris Bldg. Co.*, 706 S.W.2d 65, 68–69 (Mo.App. 1986). The ground beneath the fence would appear to be necessary to support it or at least to make the fence effective. Absent sufficient ground beneath it, livestock might go under it at will.[4]

rimeter fence. The Plaintiffs had no such duty and the Defendants had the duty to take initiative to make such repairs. The Defendants' effective remedy was to make the repairs and charge back to the Plaintiffs any cost for materials and equipment.

**3.          FINDINGS OF FACT**

6. That at all times mentioned herein, the Defendants had exclusive control for their business operation of raising Elk and knowledge of that particular animal, which was superior to the Plaintiffs.

31. That at all times herein, Defendants maintained exclusive possession of the ranch until they vacated it in April of 1987.

32. That at all times herein, Plaintiffs only right to enter the ranch was for the purpose of inspecting and counting the Elk; that Plaintiff, A.P. Leonards, seldomly visited the ranch.

53. That at all times mentioned herein, the Defendants had the peaceful possession of the leasehold and the beneficial enjoyment of the premises.

CONCLUSIONS OF LAW

2. That Defendants, under the terms of the Lease, at all times had the exclusive possession of the leasehold, not limited to, but including exclusive grazing rights and the exclusive right to cut hay off the premises.

3. The Plaintiffs, under the terms of the Lease, had no right to enter the premises, except for the purpose of making inspections thereof, and counting the number of Elk, unless invited by the Defendants.

4. The Defendants were in exclusive control of their business activity on the ranch, and the Plaintiffs had no duty whatsoever to participate in that activity and, in fact, had no right to interfere with that activity. Any assistance provided by Plaintiffs to Defendants in their business activity of raising Elk, was gratuitous in nature, and placed no obligation on Plaintiffs to conduct any part of Defendants' business.

4. Depending on the circumstances, a fence has sometimes been held to be a structure or a building, and sometimes not, under various re-

■ Defendants' obligation to maintain and repair the fence has no exception for structural defects. However, it is not necessary to decide if defendants were required to make structural repairs to the fence. Due to the distance of the fence and its costs, washouts over a relatively small area do not establish as a matter of law that repairing the washouts was structural. There was evidence that such washouts are an ordinary part of a livestock operation in the area.

The trial court determined that washouts are a regular part of operating a fenced ranch or farm, and under the lease repairing them was defendants' duty. As defendants had possession of the property, they would have to notify plaintiffs of the materials and equipment needed to make the repairs.

■ Plaintiff A.P. Leonards' testimony supports the trial court's finding that Williams agreed or at least acquiesced in the manner in which the fence was to be constructed, due to the time limitations and the necessity to get the fence constructed to hold the elk which were arriving while the fencing was being constructed. There is no dispute that Williams knew how the fence was being built and no issue that Williams lacked authority to agree to it. Defendants contend he did not agree or acquiesce.

It may be the problem with washouts was magnified due to the filling of certain hollows, but the trial court was justified in finding that defendants agreed to the fence as constructed based on Leonards' testimony of his discussions with Williams and defendants' moving their elk upon the premises and paying the rent during and after the fencing without objection or complaint. There was no evidence that defendants, through Williams or otherwise, suggested any alternate method of fencing through hollows. It is obvious they could not be fenced without special measures not provided in the lease.

■ Even if the fencing was defective because of filling the hollows, the trial court could determine that these defects had been waived. A waiver of defects in construction can occur when there is knowledge and acquiescence. *Haysler v. Owen,* 61 Mo. 270, 274 (1875). See also *Pasquel v. Owen,* 186 F.2d 263, 270 (8th Cir.1950); 13 Am.Jur.2d Building and Construction Contracts § 55, p. 59 (1964). Williams knew about filling in the hollows and A.P. Leonards' testimony indicates he acquiesced to it.

■ As defendants assert, waiver is an affirmative defense, which should be pleaded. Rule 55.08. However, testimony regarding waiver was presented without objection. As such evidence was not relevant to any other issue in the case, the pleadings are deemed amended by implication or consent under Rule 55.33(b) to include this issue. See *Gee v. Gee,* 605 S.W.2d 815, 817 (Mo.App.1980).

■ In addition, there was evidence from which the trial court was justified in finding that defendants' problems on the ranch were not due to the fencing, but primarily to mismanagement after Williams left as manager; that defendants' losses were caused by elk dying as the result of parasites and worms, and overfeeding of corn and the wrong kind of hay. There was evidence that not harvesting antlers in 1985 was due to defendants' delay in constructing corals, their obligation under the lease.

There was substantial evidence to support the trial court's finding and it did not erroneously declare or apply the law. Un-

strictive covenants, ordinances or statutes. See *Thomas v. Depaoli,* 778 S.W.2d 745 (Mo.App. 1989); *Sherwood Estates Homes Ass'n v. McConnell,* 714 S.W.2d 848 (Mo.App.1986); *Arizona Fence Contractors Ass'n v. City of Phoenix A. & A. Bd.,* 7 Ariz.App. 129, 436 P.2d 641 (1968); *City of Chicago v. Pielet,* 342 Ill.App. 201, 95 N.E.2d 528 (1950); *Joy v. State,* 460 N.E.2d 551 (Ind.App. 1st Dist.1984); *Chertkof v. Spector Baltimore Terminal, Inc.,* 263 Md. 550, 284 A.2d 215 (1971); *State* *v. Walsh,* 43 Minn. 444, 45 N.W. 721 (1890); *Cardinal Fence Co. v. Commissioner, Bur. of Rev.,* 84 N.M. 314, 502 P.2d 1004 (1972); *State v. Zumpano,* 146 N.E.2d 871 (Ohio App.1956); *Stewart v. Welsh,* 142 Tex. 314, 178 S.W.2d 506 (1944); *Alexander Schroeder Lumber Co. v. Corona,* 288 S.W.2d 829 (Tex.Civ.App.1956); *State v. Roadhs,* 71 Wash.2d 705, 430 P.2d 586 (1967); *Karasek v. Peier,* 22 Wash. 419, 61 P. 33 (1900); *Keller v. Branton,* 667 P.2d 650 (Wyo.1983).

der our limited review the judgment must be affirmed.

The judgment is affirmed.

MAUS, P.J., and CROW, J., concur.