**Robert LEGG, Respondent,**

v.

**CERTAIN UNDERWRITERS AT LLOYD'S OF LONDON,**
**Appellant.**

**Nos. WD 56067, WD 56283.**

Missouri Court of Appeals,
Western District.

Dec. 14, 1999.

Motion for Transfer to
Supreme Court Denied Feb. 1, 2000.

Daniel F. Church, Lenexa, KS, for appellant.

Richard C. Miller, Kansas City, for respondent.

Before: Presiding Judge LAURA DENVIR STITH, Judge LOWENSTEIN and Judge EDWIN H. SMITH.

LOWENSTEIN, Judge.

Robert Legg (Legg) filed a petition for damages for breach of an insurance contract and for vexatious refusal to pay, against Certain Underwriters at Lloyd's of London (Lloyd's). Lloyd's had issued a "Contractor Protection Plan" (the "Plan") to the trucking company for which Legg was a contract driver. The policy provided total disability coverage to Legg as an insured if he became disabled as the result of an occupational accident. The Plan provided up to $300,000 in benefits for an occupational accident and a maximum of $15,000 in benefits for non-occupational accidents. Legg, after leaving Liberty, Mo., was in Georgia, en route to making a delivery in Florida, when he was injured. After parking his truck for the night, Legg, who became intoxicated, was in a car with another man, also intoxicated, when the car overturned leaving Legg with severe and paralyzing spinal cord injuries. The crucial questions involving the policy provisions concerned whether:

1) The injuries were sustained while Legg was "under dispatch", making the accident an occupational accident as defined by the Lloyd's policy. By way of summary judgment, the trial court ruled in Legg's favor on this point.[1]

2) An exclusion provision would disqualify the claim if Legg was intoxicated,[2] making dispositive the answer to the question whether he was a passenger, rather than the driver of the car. After a bench trial on this provision, the court found Legg was not driving the car and the exclusion did not thwart the claim.

The trial court then found Lloyd's refusal to pay vexatious and awarded fees and expenses. Lloyd's has appealed.

In April 1992, respondent Legg was an independent contractor/truck driver for Inway and had picked up a load from the Kansas City area for delivery to Maxville, Florida. En route, he was advised that since he would be unable to arrive at his destination before the close of business on Friday, April 24, he would have to wait until Monday morning to make the delivery and unload the truck. Accordingly, he arrived at a truck stop in Valdosta, Georgia, between 5:00 and 7:00 p.m. on Friday, April 24. He then secured the truck for the weekend, intending to continue the trip to Florida on Monday morning, and testified to such.

Later on Friday evening, Legg walked to a nearby Best Western motel and entered the King of the Road Lounge, a bar that served alcoholic beverages. He stayed at the lounge until closing time early Saturday morning. He was intoxicated when he left the lounge; it was

---

1. In paragraph (7) of the policy, the Plan distinguishes between and defines "occupational" and "non-occupational" accidents. The first is "an accident occurring during the usual and customary performance of duties required by the Insured Person's normal work, which shall include travel between assigned destinations and/or under dispatch," while the latter is "an accident occurring while an Insured Person is not performing the duties of his occupation as defined in definition (7) [above]."

2. "The insurance under the Master Policy does not cover loss caused by or resulting from any one or more of the following...

 1. Loss caused by or resulting from:
 e. Intoxication or being under the influence of a controlled substance unless prescribed by and taken under the supervision of doctor."

stipulated that laboratory blood results taken more than an hour after the accident showed Legg's blood alcohol level to be .135.

While drinking, Legg became acquainted with another patron, James Hudson, who also became intoxicated during the evening. The bartender, Cathy Mixer, recalls that Legg and Hudson met each other at the bar and talked and purchased drinks for each other. She further testified that Hudson became so intoxicated that she took his keys and said she would drive him home. Hudson testified that when the bar closed, he was so intoxicated that he was in no condition to drive, and therefore, gave his keys to Mixer intending that he not drive himself home.

Legg and Hudson left the lounge together. Subsequently, after 2:00 a.m. on Saturday, April 25, 1992, Legg and Hudson were involved in a one-car accident, approximately ½ to ¾ miles from the bar. Hudson's vehicle overturned, rolled down an embankment, and landed on its top. The investigating police officer estimated Hudson's car was traveling at least 75 miles per hour at the time of the accident.

There was dispute as to whether Hudson or Legg was driving the car at the time of the accident. Legg testified that Hudson offered to drive respondent back to his truck, and he was a passenger. Legg testified he crawled into the back seat on the driver's side after the accident, and told an investigating police officer he had been a passenger. However, the car was traveling away from the truckstop at the time of the accident.

Contrarily, Hudson testified he was not driving the car at the time of the accident and that he had given his car keys to the bartender, who must have given them to Legg. Hudson further testified that he remembers leaving the bar with Legg and getting into the passenger side of his car.

He had no recollection of why the car was headed northbound, as Hudson's home was located to the south of the lounge. The bartender confirmed several facts related by Hudson, ultimately that she gave Legg the keys and saw the two leave together, but did not see them physically get in to the car.

As a result of the April 25, 1992, car accident, Legg sustained a fractured dislocation of his thoracic spine resulting in paraplegia from the waist down, chest trauma, and pulmonary contusions. Lloyd's first received report of his claim for benefits on April 27, 1992. Claims manager Brenda J. Cullinan was assigned to the supervision of the claim by Claims Management Corporation (hereinafter "CMC"), which is the third-party administrator for Lloyd's on claims under the Plan. Over the next two months, CMC's investigation included interviewing witnesses, securing medical and law enforcement records, and obtaining an initial statement from respondent.

On June 26, 1992, Cullinan advised Legg by letter that the claim for occupational accident benefits was denied because it was not determined to be an occupational accident. Further the claim was excluded, as the loss was the result of voluntary intoxication. However, the Plan did offer respondent the full amount of the non-occupational accident coverage of $15,000, due to the tragedy and substantial loss to his family, with the express language that they were not making any admission of liability.

Legg made no response to the denial letter, nor any communication relating to his claim for almost the next two years. Then on September 12, 1994, this action for damages and vexatious refusal to pay, § 375.296 and 375.420 RSMo 1994, was filed.[3] Lloyd's raised the occupational accident policy definition and the intoxication

---

**3.** All further references to Missouri statutory law will be to the Revised Statutes of Missouri of 1994.

exclusion as affirmative defenses. The trial court granted respondent's motion for summary judgment holding that as a matter of law, Legg sustained an occupational accident because he was "under dispatch" at the time of the accident as he had not completed his trip to Florida and unloaded his truck. After trial on the intoxication issue, the court found that both Legg and Hudson were intoxicated, Hudson was the driver and Legg the passenger at the time of the accident, and that Lloyd's failed to present sufficient evidence that respondent got into the vehicle knowing Hudson was intoxicated and unfit to drive. Therefore, the court concluded that respondent's loss was not "caused by or resulting from his intoxication" and found the denial of respondent's claim was vexatious, willful, and without reasonable cause.

The trial court further approved Legg's fifty-percent contingent attorney's fee as reasonable and entered a final judgment awarding the claimant the total sum of $608,806.57. This sum was for benefits owed under the Plan, prejudgment interest, statutory penalties under Missouri vexatious refusal to pay statute (§ 375.296) attorney's fees of $184,289.67 (§ 375.420) and litigation expense reimbursement of $14,984.28.[4]

Lloyd's points on appeal are straightforward and direct: 1) Under the Plan, since Legg was not performing any occupational functions at the time of the accident, he was not "under dispatch" and was ineligible for occupational benefits; 2) Even if this event was covered, Legg's intoxication excluded him from benefits; 3) Lloyd's was prejudiced by the court's exclusion of expert testimony which would have shown Legg to be the driver; 4) Damages for vexatious refusal to pay, § 375.296, should not have been assessed; and, 5) The trial court erred in awarding litigation and attorney fees under § 375.420.

4. These statutes are set out in the Appendix to

## POINTS RELIED ON

### I. Was this an occupational accident and was Legg "Under Dispatch"

The standard of review for this grant of summary judgment is under *ITT Commercial Finance Corp. v. Mid–America Marine Supply Corp.*, 854 S.W.2d 371, 376 (Mo. banc 1993). The propriety of summary judgment is a matter of law, and will be upheld on appeal if: (1) there is no genuine dispute of material fact, and (2) the movant is entitled to judgment as a matter of law. *Id.* at 377.

 Lloyd's first point is indeed a question of contract interpretation, and therefore, a question of law. *Millers Mut. Ins. Ass'n of Illinois v. Shell Oil Co.*, 959 S.W.2d 864, 866 (Mo.App.1997) citing *Moore v. Commercial Union Ins. Co.*, 754 S.W.2d 16, 18 (Mo.App.1988). "No deference is due the trial court's judgment where resolution of the controversy is a question of law." *Id.* citing *MFA Mut. Ins. Co. v. Home Mut. Ins. Co.*, 629 S.W.2d 447, 450 (Mo.App.1981). When construing an insurance contract under our state's law, the contract should be construed against the preparer. The question here is whether the insurance policy is ambiguous. If so, the policy must be construed against the insurer. *Peters v. Employers Mutual Cas. Co.*, 853 S.W.2d 300, 302 (Mo. Banc 1993), citing *Robin v. Blue Cross Hosp. Serv. Inc.* 637 S.W.2d 695, 698 (Mo banc 192), citing *Rodriguez v. Gen. Accident Ins. Co.*, 808 S.W.2d 379, 382 (Mo. banc 1991).

 This first point argues the trial court erred in holding that claimant sustained an occupational accident as defined by the Plan's policy because he was not engaging in any occupational-related activity at the time of the accident, but rather was in another's personal automobile. At first blush, this argument sounds convincing. However, the issue must be decided based on the language of Lloyd's policy, and precisely on whether or not the employee being "under dispatch" includes the

this opinion.

facts here.[5]

An occupational accident is defined in the Plan's policy as "an accident occurring during the usual and customary performance of duties required by the Insured Person's normal work, *which shall include travel between assigned destinations and/or under dispatch.*" (emphasis added). What is not defined by the Plan and what causes the controversy in this suit is the meaning of the phrase "under dispatch." Pursuant to the testimony of Lloyd's own witness, among other evidence, the trial court found that a truck driver is "under dispatch" if he has picked up a load and is on the way to make delivery.

This is a logical definition and is consistent with caselaw definitions of "under dispatch." The fact that a driver has stopped doesn't mean he is not under dispatch for it is common place and necessary for a truck driver to make several stops to sleep, eat or deal with weather problems when en route to destinations. The U.S. Department of Transportation also has regulations forbidding truck drivers to travel cross-country nonstop as it would be unsafe.

In *Great West Casualty Co. v. Wenger,* 748 S.W.2d 926, 927 (Mo.App.1988), this court stated "[I]t is understood in the trucking industry that a truck is under dispatch from the time the load is picked up for transport until the driver returns the empty trailer." See e.g.,*Gulf Ins. v. Kingman,* 61 F.3d 905 (7 th Cir.1995) citing *Liberty Mutual Ins. Co. v. Connecticut Indemnity Co.,* 55 F.3d 1333 (7 th Cir. 1995). The trial court's findings and conclusions included "at the time of the accident, Plaintiff was 'under dispatch' as that term is defined in the policy and sustained an 'occupational accident' under the terms of the policy."

With no specific definition of "under dispatch," the term which is included in the policy's own language, the policy is subject to a reasonable interpretation that the driver was "under dispatch" until he could deliver the load to Florida. This may not have been Lloyd's intent in drafting the language, but it leaves this term to interpretation. At best, the policy is ambiguous, and again under Missouri law, any ambiguity under an insurance policy must be construed against the insurer. *Peters v. Employers Mut. Cas. Co.,* 853 S.W.2d 300, 302 (Mo. banc 1993), citing *Robin v. Blue Cross Hosp. Serv. Inc.,* 637 S.W.2d 695, 698 (Mo. banc 1982), citing *Rodriguez v. Gen. Accident Ins. Co.,* 808 S.W.2d 379, 382 (Mo. banc 1991).

Lloyd's drafted its own policy, and chose to use the "under dispatch" language, which explicitly broadened coverage to protect insured truckers while away from home. Although the parties make technical arguments about word modification and agreement, ultimately the policy is ambiguous, and therefore, must be construed in favor of the insured.

Legg was en route with an unfinished delivery from Missouri to Florida when he was involved in the accident in Georgia. According to the policy language as written, the delivery was not complete, so he was under dispatch at the time of the accident. Point denied.

## II. Applicability of the Intoxication Exclusion

■ Lloyd's next argues that the trial court erred in holding the loss was not caused by or resulting from intoxication. This again deals with the interpretation of an insurance policy, and accordingly is a question of law that grants no deference to the trial court's conclusions and adheres to the same standard of review as point one. An insurance policy interpretation is a question of law and is to be construed strictly against the insurer. *See Millers Mut., supra.,* 959 S.W.2d at 866.

---

**5.** The fact that Legg was intoxicated is not relevant to whether he was under dispatch. It is relevant to the intoxication exception, discussed *infra.*

The trial court found that both Hudson and respondent were intoxicated at the time of the accident and that Hudson was the driver at the time of the accident. Although appellant argues in Part III *infra.* that those findings of fact were erroneous in that Respondent rather than Hudson was the driver of the car, for the purposes of this point, Lloyd's assumes the findings of fact as found by the trial court, and this court will do likewise.

Appellant points out that the policy does not limit recovery to losses caused by or resulting from *the Insured's* intoxication. Again, the policy reads:

> The insurance under the Master Policy does not cover loss caused by or resulting from any one or more of the following...
>
> 1. Loss caused by or resulting from:
>
> e. Intoxication or being under the influence of a controlled substance unless prescribed by and taken under the supervision of doctor.

Lloyd's argues that but for the intoxication of the driver, Hudson, a one-car collision in which a vehicle overturned, rolled down an embankment, and landed on its top would not have happened. It further contends that even though the driver was found to be Hudson, the intoxication exclusion still bars recovery because respondent's intoxication impaired his judgment, resulting in his failure to observe that Hudson was not fit to drive. Basically, it argues that but for Legg's intoxicated state, he would have realized Hudson was too intoxicated to drive and would not have placed himself in the car. Lloyd's makes the ultimate argument that intoxication was the proximate cause for Legg being in the car, whether or not it was the proximate cause of the wreck, resulting in the intoxication exclusion in the policy being applicable and a basis for denying recovery.

■ The insurer bears the burden of proof to establish the application of an exclusion. *Crollard v. N. Life Ins. Co.*, 240 Mo.App. 355, 200 S.W.2d 375, 381 (1947). An insurance company seeking to escape coverage based upon a policy exclusion has the burden of proof to establish the applicability of such exclusion. *Am. Family v. Copeland–Williams*, 941 S.W.2d 625, 627 (Mo.App.1997); *Northland Ins. Cos. v. Russo*, 929 S.W.2d 930, 935 (Mo.App.1996) citing *First Assembly Church v. Ticor Title Ins.*, 872 S.W.2d 577, 582 (Mo.App. 1994). Additionally, exclusionary language should be strictly construed against the insurer. *Killian v. State Farm Fire & Cas. Co.*, 903 S.W.2d 215, 217 (Mo.App. 1995) citing *Walters v. State Farm Mut. Auto. Ins. Co.*, 793 S.W.2d 217, 219 (Mo. App.1990).

■ In Missouri, a circumstance must be the proximate cause of injury or death in order to be validly excluded from coverage under an insurance policy, not merely a contributing cause. *Harris v. New York Life Ins. Co.*, 516 S.W.2d 303, 307 (Mo. App.1974) citing *Gennari v. Prudential Ins. Co. of Am.*, 324 S.W.2d 355, 357 (Mo. App.1959). "A cause is proximate if is it the efficient cause which sets in motion the chain of circumstances leading up to the damage and which in a natural, continuous sequence, unbroken by a new and independent cause, produced the damage." *John Drennon & Sons Co. v. New Hampshire Ins. Co.*, 637 S.W.2d 339, 341 (Mo.App. 1982) citing *Boecker v. Aetna Cas. & Surety Co.*, 281 S.W.2d 561, 565 (Mo.App.1955).

Lloyd's employee, Ms. Cullinan, in denying the claim, stated that alcohol at best played only an indirect role in this accident. Similar to the policy's language in point one, the alcohol exclusion is unclear and ambiguous as written. Although it does not explicitly limit the intoxication to that of the insured, the phrase is at best ambiguous in that a number of situations could arise that would bar recovery when it was clearly warranted. For example, if the insured's interpretation of the intoxication exception is accepted, then, if an insured was asleep in his truck and was hit by a drunk driver, as the policy is written, he could be barred from recovery because

intoxication was involved, obviously through no fault of his own. The language of the policy is simply ambiguous and as such, must be strictly construed against the insurer. *See Peters, supra.*

The trial court found that Legg was not driving the car at the time of the accident. This court does not find it plausible to make the leap to conclude that his decision to get in the car with the intoxicated Hudson was the cause or result of his loss. Further, appellant clearly has the burden of showing respondent's intoxication was the proximate cause of the accident, which was not proven.

Therefore, this court affirms the trial court's finding that Lloyd's failed to present sufficient evidence that respondent entered Hudson's car knowing that Hudson was intoxicated and unfit to drive. The policy must be construed in favor of the insured. As written, the intoxication exclusion included in the policy can not be applied to the situation at hand. Point denied.

### III. Exclusion of Experts

■ Appellant next contends that the trial court erred when it excluded appellant's expert witnesses who would have testified as to their opinion that respondent was the driver of the car. This point is reviewed for an abuse of discretion.

> The admissibility of evidence is within the discretion of the trial judge. (citations omitted) The trial court's ruling is upheld when there exists any recognizable ground on which the trial judge could have rejected the evidence. (citations omitted) When the trial court's ruling is clearly against the logic of the circumstances then before the court, and when the court's ruling is so arbitrary and unreasonable that one's sense of justice is shocked and a lack of careful consideration is manifest, the trial court has abused its discretion. (citations omitted) 'Errors regarding the admission or exclusion of evidence will result in rever-

sal only if there is substantial and glaring injustice.'

*State ex rel. Missouri Highway and Transp. Comm'n v. Buys,* 909 S.W.2d 735 (Mo.App.1995).

Missouri caselaw has consistently held that courts have broad discretion to strike expert witnesses who are not timely filed. *State ex rel. Missouri Highways and Transp. Comm'n v. Legere,* 706 S.W.2d 560 (Mo.App.1986). Further, the *Buys* case holds that exclusion of evidence does not result in reversible error unless it would have changed the outcome. *Buys,* 909 S.W.2d at 739 citing *Lewis v. Wahl,* 842 S.W.2d 82, 85 (Mo. banc 1992).

The record indicates that Lloyd's offered the expert witnesses it intended to call at trial only nineteen days before trial, while the trial date had been set for over nine months, with the original suit being filed approximately three years earlier. The company was fully aware that it bore the burden of proving the applicability of the exclusion, yet still did not identify its experts until nineteen days before trial. Legg filed a motion to strike the expert witnesses as the late identification prejudiced them in that it would be difficult, if even possible, to depose the witnesses and prepare for respondent's expert testimony before trial the next week.

Lloyd's put forth no legitimate excuse for the delay, nor was its later suggestion of bifurcating the trial a feasible solution. Further, the trial court found that the stricken testimony was cumulative evidence of what was already being produced at trial. The *Buys* case supports this finding in holding that the exclusion of testimony did not create a substantial and glaring miscarriage of justice since the point at issue had been established by other evidence. *Buys,* 909 S.W.2d at 739. Hudson's own testimony, as well as inferential testimony by the bartender, was offered to show that respondent was the driver. However, since the trial court properly sustained respondent's motion to strike expert witnesses on the basis that they were

not timely filed, this court need not determine whether the expert witness testimony would be so cumulative as to disallow it on that basis alone. Point denied.

## IV. Vexatious and Willful Penalties

■ The fourth argument is that the trial court erred in holding that the insurer vexatiously and willfully denied Legg's claim for benefits. The appropriate standard of review is set forth in *State ex rel. Webb v. Hartford Casualty Ins. Co.*, 956 S.W.2d 272 (Mo.App.1997), holding that statutes providing for damages for insurer's vexatious refusal to pay are penal in nature and are to be strictly construed.

Sections 375.296 and 375.420 allow penalties to be assessed against an insurer when it refuses to make payment, upon demand and in accordance with the policy, vexatiously, willfully and without reasonable cause. However, "[a]n insurer is permitted to question or contest its liability if it has reasonable cause to believe, and does believe, that it has no liability under the policy and that it has a meritorious defense." *Webb*, 956 S.W.2d at 276 (Mo. App.1997) *citing Groves v. State Farm Mut. Auto. Ins. Co.*, 540 S.W.2d 39, 42 (Mo. banc 1976). "Only when the insurer continues to refuse to pay after it has become aware that it lacks a meritorious defense does it become liable for vexatious delay." *Id.* citing *Morris v. J.C. Penney Life Ins. Co.*, 895 S.W.2d 73, 76 (Mo.App. 1995). "However, '[t]he existence of a litigable issue does not preclude a vexatious penalty where there is evidence that the insurer's attitude was vexatious and recalcitrant in refusing the claims.'" *Id. Pemiscot County v. Western Surety Co.*, 51 F.3d 170 (8 th Cir.1955).

■ Further, where there is an open question of law or fact relating to a claim under an insurance policy, the insurer may insist upon a judicial determination of those questions without being penalized for vexatious refusal to pay. *Mears v. Columbia Mutual Ins. Co.*, 855 S.W.2d 389, 394 (Mo.App.1993). "The test for a vexatious refusal claim is not the final resolution of the coverage issues but how willful and unreasonable the insurer's refusal was as the facts appeared to a reasonable and prudent person at the time the insurer was asked for coverage..." *Wood v. Safeco Ins. Co. of Am.*, 980 S.W.2d 43, 55 (Mo.App.1998) (citations omitted).

It is clear to this court, by the very fact the trial court decided it necessary to try the issues of who was the driver and the application of the intoxication exclusion, that issues were presented that were unclear. The facts and issues of this case were of first impression to Missouri courts, and under these facts, the court cannot say Lloyd's refusal subjected it to the penalty provisions of the statutes. The first two points of this opinion address the questions of law concerning the interpretation of the insurance policy's language, distinctly addressing the valid and reasonable disputes of whether or not respondent was "under dispatch" at the time of the accident as well as the applicability of the intoxication exclusion. Accordingly, the trial court erred in granting statutory penalties and attorney's fees in favor of respondent, and that part of the judgment is hereby reversed.

## V. Litigation Expenses

■ Appellant's final argument contends that the attorney's fees awarded to respondent are unreasonable and that the respondent's litigation expenses should not have been awarded under the vexatious and willful statutes. There is no need for this court to address the reasonableness of attorney's fees since that part of the judgment has been reversed.

■ The trial court awarded the respondent litigation expenses as well as the penalties and attorney's fees that are afforded under RSMo § 375.420. The statute, being penal in nature, is to be strictly construed. *Housing Auth. of City of Clinton, Evans Elec. Const. Co. v. Baumann,*

512 S.W.2d 436, 440 (Mo.App.1974) citing *Duckworth v. United States Fidelity and Guaranty Co.*, 452 S.W.2d 280, 287 (Mo. App.1970). The only authority respondent cites inferentially supporting any awards rather than attorney's fees or the statutory penalty under RSMo § 375.420 is *Housing Authority supra,* which states "the claim for such penalties may also include the amount of suit expenses involved in collecting the insurance" (*Willis v. American National Life Insurance Company,* 287 S.W.2d 98 (Mo.App.1956)). However, when read closely, this statement is pulled out of context as the case goes on to declare that "when vexatious delay occurred and plaintiff was necessarily required to go to expense of obtaining counsel to collect what was rightfully due her, she then and there became entitled to an additional sum for attorney's fees and tender by insurance company of face amount of policy did not extinguish her right to attorney's fees." *Id.* at 98.

No authority has been cited, nor could this court find any, specifically stating that litigation expenses other than attorney's fees are allowed pursuant to the penalty statutes. As such, the penalty statute must be strictly construed, which results in the reversal of the litigation expenses awarded to respondent.

### CONCLUSION

The court's ruling in favor of Legg as to the accident being occupational because he was under dispatch, as to the intoxication exclusion being inapplicable, and as to the exclusion of appellant's expert evidence is affirmed. The judgment finding the insurer liable under § 375.296 and 375.420 for attorney's fees, statutory penalties, and litigation expenses is reversed.

All concur.

### § 375.296. Additional damages for vexatious refusal to pay

In any action, suit or other proceeding instituted against any insurance company, association or other insurer upon any contact of insurance issued or delivered in this state to a resident of this state, or to a corporation incorporated in or authorized to do business in this state, if the insurer has failed or refused for a period of thirty days after due demand therefor prior to the institution of the action, suit or proceeding, to make payment under and in accordance with the terms and provisions of the contract of insurance, and it shall appear from the evidence that the refusal was vexatious and without reasonable cause, the court or jury may, in addition to the amount due under the provisions of the contract of insurance and interest thereon, allow the plaintiff damages for vexatious refusal to pay and attorney's fees as provided in section 375.420. Failure of an insurer to appear and defend any action, suit or other proceeding shall be deemed prima facia evidence that its failure to make payment was vexatious without reasonable cause.

### § 375.420. Vexatious refusal, to pay claim damages for, exception

In any action against any insurance company to recover the amount of any loss under a policy of automobile, fire, cyclone, lightning, life, health, accident, employers' liability, burglary, theft, embezzlement, fidelity, indemnity, marine or other insurance except automobile liability insurance, if it appears from the evidence that such company has refused to pay such loss without reasonable cause or excuse, the court or jury may, in addition to the amount thereof and interest, allow the plaintiff damages not to exceed twenty percent of the loss in excess of fifteen hundred dollars and a reasonable attorney's fee; and the court shall enter judgment for the aggregate sum found in the verdict.