

# In the Missouri Court of Appeals
## Eastern District

### DIVISION FOUR

| | | |
|---|---|---|
| SCHECK INDUSTRIAL CORPORATION, | ) | |
| | ) | No. ED100371 |
| Plaintiff/Appellant, | ) | |
| | ) | Appeal from the City of St. Louis |
| vs. | ) | Circuit Court |
| | ) | |
| TARLTON CORPORATION, ET AL., | ) | Honorable Joan L. Moriarty |
| | ) | |
| Defendant/Respondent. | ) | Filed: July 15, 2014 |

### Introduction

In this dispute involving the breach of a construction contract, subcontractor Scheck Industrial Corporation (Plaintiff) appeals the amended judgment of the Circuit Court of the City of St. Louis entered after a bench trial in favor of general contractor Tarlton Corporation (Defendant) on Plaintiff's claims for account stated and breach of contract and on Defendant's counterclaims for breach of contract, breach of warranty, and indemnification, and for Defendant's request for attorney fees. On appeal, Plaintiff claims that the trial court abused its discretion by barring Plaintiff's retained expert from testifying. Plaintiff also claims that the trial court's amended judgment against Plaintiff on its claims of account stated and breach of contract is "against the manifest weight of

the evidence and a misapplication of the law" because: (1) Defendant did not dispute Plaintiff's invoices and admitted it owed Plaintiff compensation for work performed; (2) Plaintiff performed its obligations under the Subcontract in a "workmanlike manner" and Defendant accepted Plaintiff's work thereby waiving its right to object; and (3) the Subcontract's "pay-if-paid" clause is inapplicable. Plaintiff further claims that the trial court's amended judgment for Defendant on its counterclaims is "against the manifest weight of the evidence and a misapplication of the law" because: (1) Defendant did not prove that Plaintiff's work was not performed in a "workmanlike" manner and Defendant failed to perform its obligations under the Subcontract, the Subcontract's warranty provision is inapplicable, and Defendant failed to mitigate its damages; (2) Defendant failed to establish it was entitled to indemnification under the Subcontract; and (3) Defendant failed to establish that it was entitled to damages or attorney fees. We affirm.

### Factual Background[1]

In March 2008, Defendant entered into a Contract with the electric utility company Ameren under which Defendant agreed to perform certain work related to the repair of Ameren's Taum Sauk hydroelectric power plant. Defendant was the general contractor on the project, charged with performing general contracting services pursuant to the terms of the Contract. Pertinent to this dispute, the Contract required Defendant to cut eight drain access ports into the lower section of the plant's "penstock," weld steel collars composed of A572 carbon steel around each port, and install removable covers or

---

[1] The facts are presented in a light most favorable to the trial court's amended judgment. *Wildflower Cmty. Ass'n, Inc. v. Rinderknecht*, 25 S.W.3d 530, 534 (Mo. App. W.D. 2000).

2

doors over these ports.[2] The penstock is a one-mile long tunnel, 18 feet in diameter, which transfers water from a water reservoir to turbines in an electricity-generating facility. The upper portion of the penstock is composed of A201 steel, while the lower portion, where the drain access collars were to be installed, is composed of T-1 steel.[3]

*The Subcontract*

Because Defendant did not have the requisite expertise to install the collars on each of the eight drain access ports required under the Contract, it entered into a Subcontract with Plaintiff in January 2009, under which Plaintiff agreed to complete these repairs of the penstock on a "time and materials" basis.[4] The Subcontract's opening paragraph incorporated the Contract making it part of the Subcontract, as well as all the "contract documents" that made up the Contract. These contract documents included numerous drawings and specifications as identified in "Attachment A" of the Subcontract, of which drawing 8304-X-26058 specified that the lower portion of the penstock is composed of T-1 steel and the upper portion of A201 steel.

Pertinent to this appeal, the Contract contained a warranty provision, under which Plaintiff warranted "that the Work performed under the Contract will be free from defects in design, [the] workmanship . . . will be suitable for its intended purpose [and] the Work will comply with the specifications, drawings, samples and other descriptive information

---

[2] Each port is about 22 feet wide. The steel collars are inch-thick plates that were welded onto the inside of the penstock around each port to provide strength.

[3] T-1, A201, and A572 carbon steel are different types of steel. T-1 is a low-alloy high-strength quenched and tempered steel, whereas A201 is a lighter, lower strength steel. A572 has a higher strength than T-1 steel.

[4] The Subcontract's Attachment B identified the scope of work to be completed, including assisting in the drilling of the penstock, patching "grout nipple holes," and installing and welding plates "per drawings and specifications." The specifications did not include a welding procedure.

as furnished or specified in the Contract . . . ."  In addition, paragraph 33 of the Contract included the following provision pertaining to attorney fees:

> In the event it shall become necessary for [Defendant] to retain the services of an attorney for the purposes of enforcing any provisions of this Contract, [Plaintiff] shall pay the costs of the court and the reasonably [sic] attorneys' fees incurred.

Regarding the relevant provisions of the Subcontract, Part I of the Subcontract concerned "payment" and included the following "pay-if-paid" clause, applicable to both progress payments and final payments:

> Progress payments will be made each month from funds received from [Ameren] as and when the funds are received for the proportionate contract value of work completed and/or materials delivered to [the] site . . . .  Such partial payments shall not become due [Plaintiff] unless and until 7 days after [Defendant] has received payment for such work and materials, it being a condition precedent to [Defendant's] obligation to pay [Plaintiff] that [Defendant] has received payment from [Ameren] for work and materials referred to.

> Final payment shall not be due until the work described in this contract is fully completed and performed in accordance with the Contract Documents . . . <u>and</u> final payment from [Ameren] is received by [Defendant], it being a condition precedent to [Defendant's] obligation to pay [Plaintiff] that [Defendant] has received final payment from [Ameren] for work and materials referred to.  (Emphasis in original).

Part II of the Subcontract contained certain "special requirements" and, under subpart (H), listed numerous "general" provisions pertaining to Plaintiff's obligations and further agreements between the parties.  Paragraph 17 of Part (II)(H) is an indemnity clause, which provides:

> [Plaintiff] agrees to indemnify and hold harmless [Defendant], its Directors, Officers and Employees from and against any and all loss, claims, suits, causes of action, liability, damages, costs, expenses and/or attorney fees incurred by [Defendant] or its successors, assignees and sureties as a result

4

of any failure, neglect or inability of [Plaintiff] to pay its suppliers, material men or subcontractors (i.e., sub-subcontractors of [Defendant]) or as a result of [Plaintiff's] breach or alleged breach of, or any dispute in connection with, any contract or order, whether expressed or implied, with any such sub-subcontractors, or with suppliers or material men to [Plaintiff], or as a result of any claim made by such sub-subcontractor, suppliers or material men to [Plaintiff] to [Defendant] or on any Performance and/or Payment Bond posted by [Defendant] in connection with the construction job which is the subject of this Agreement, or as a result of any personal injury or property damage arising out of or in connection with this Subcontract or any work or operations under or in connection with this Subcontract, and from personal injury or property damage resulting from use by [Plaintiff] or its sub-subcontractors of any equipment owned or rented by [Defendant].

Further, under paragraphs 30 and 32 of Part (II)(H), Plaintiff and Defendant agreed that Plaintiff would undertake personal investigation of the conditions affecting its work and independently determine the criteria necessary to complete its obligations. Those provisions provide as follows:

[Plaintiff] agrees he is fully informed regarding all conditions affecting work to be done under, and material, equipment, apparatus and labor to be furnished for completion of this Subcontract; and also agrees and certifies that his information was secured by personal investigation and research and not from any estimates or representations of any officer, agent or employee of [Defendant].

\*     \*     \*

[Plaintiff] shall independently determine and verify all field measurements, field construction criteria, etc., as required to accomplish, erect and complete his work requirements.

*Execution of the Subcontract*

In March 2009, Plaintiff selected a welding procedure appropriate for welding A572 carbon steel to the A201 steel in the upper portion of the penstock. After Plaintiff had successfully completed the placement of the invert plates on this upper portion of the

5

penstock, it began, in early June 2009, the welding work on the eight drain access ports located in the lower portion of the penstock. Although the lower portion of the penstock is composed of a different type of steel than the upper portion of the penstock, Plaintiff did not investigate whether a different base metal was present and did not submit a new welding procedure for welding the A572 carbon steel collars to the T-1 steel of the penstock. Shortly thereafter, on June 25th when 85 percent of the welding on the drain access ports was complete, Plaintiff identified cracking in the penstock just outside the completed welds and reported this information to Defendant.

Welding continued based on the parties' belief that the cracking was an isolated incident. However, by July 2, 2009, the parties realized that the cracking was widespread and Defendant directed Plaintiff to stop its welding work and requested Plaintiff to submit a new welding method. Around the same time, James Sopata, Plaintiff's superintendent for the project, learned for the first time that the lower portion of the penstock was composed of T-1 steel.

Several weeks later, around July 29th, Plaintiff applied its new proposed welding method to a single access collar. This required Plaintiff to remove the faulty access collar, remove the cracks in the penstock, and re-weld a new access collar using the new method. After its application, Plaintiff discovered additional cracks in the penstock and the new welding method was rejected. Plaintiff made a second attempt, again removing the defective weld, fixing the cracks and placing a new weld, but cracks in the penstock appeared again.

Consequently, by August 10th, rewelding ceased entirely. Because six or seven weeks had passed since the first discovery of the cracks and no solution had been found, Defendant contacted a metallurgist engineering firm, Briem Engineering, to develop a solution. After conducting an investigation, Briem Engineering's final report concluded that the cracking was due to "weld shrinkage stresses and pre-existing residual stress levels" and recommended an alternative welding procedure appropriate for welding A572 carbon steel to T-1 steel.[5] Ultimately, Plaintiff applied Briem's recommended welding procedure beginning in October and successfully completed the work in December 2009.

In anticipation that it would have to submit a claim to Ameren for payment of Plaintiff's repair and rework of the drain access welds, Defendant asked Plaintiff to track its time separately for the repair and rework of the welds. This work included removing all the defective welds, fixing the cracks in the penstock, and re-welding anything that had already been welded once. Defendant submitted the claim to Ameren based on its understanding at that point, as Plaintiff asserted to Defendant, that the cracking was related to problems in the penstock, not Plaintiff's welding procedure. Defendant sought a total of $733,416 from Ameren, reflecting both Plaintiff's costs in completing the repair and rework and Defendant's costs to support that work.

In June 2010, Ameren rejected the claim in its entirety, indicating in a letter to Defendant that Ameren had only approved a welding procedure for the upper portion of

---

[5] At trial, Jim Briem explained that the "pre-existing residual stress levels" would exist in the penstock as a result of forming the penstock into a round-shaped pipeline and that a "weld shrinkage stress" is "inherent in any weldment" and occurs because "whenever you make a weld in a metal, you are applying molten metal, and that molten metal as it cools, contracts, and as it contracts, it pulls the adjacent metal in . . . . As it pulls the adjacent metal in, in the heat-affected zone, that creates residual stresses."

7

the penstock and that "improper welding practices" caused the lower portion of the penstock to crack. Subsequently, and after further conversation with Briem Engineering, Defendant realized that Plaintiff's position—that problems with the penstock caused the cracking—was not scientifically supportable in that "there was absolutely no engineering or metallurgical support to [Plaintiff's] claim . . . ." Ultimately, Plaintiff received payment for all its work on the project except the $553,133.51 related to the repair and rework.

*The Lawsuit*

Plaintiff then filed this account stated and breach of contract action against Defendant seeking $553,133.51, the amount allegedly owed for the repair and rework.[6] Defendant answered the petition, raising counterclaims for breach of contract, breach of warranty, and indemnification and alleging that it was owed $220,094, plus attorney fees, for costs and expenses it incurred as a result of Plaintiff's breach.

After a four-day bench trial, the trial court entered a judgment for Defendant on Plaintiff's claims of account stated and breach of contract and on Defendant's counterclaims for breach of contract, breach of warranty, and indemnification. In essence, the trial court found that the evidence did not support Plaintiff's account stated and breach of contract claims, but instead established that Plaintiff breached the Subcontract by failing to complete the welds in a workmanlike manner and by failing to investigate and independently identify the proper welding procedure to be applied to the

---

[6] Plaintiff's petition also included a count for quantum meruit against Ameren and a count for enforcement of its mechanics lien against both Defendant and Ameren. These claims were dismissed before trial.

penstock. The trial court further found that Plaintiff breached the Subcontract by failing to indemnify Defendant for costs and expenses incurred as a result of Defendant's breach and that Plaintiff's failure to perform its obligations in a workmanlike manner constituted a breach of the Subcontract's warranty provision. Accordingly, the trial court awarded Defendant $220,093.80 in "labor and general conditions costs" that Defendant incurred as a result of Plaintiff' breach. The judgment also awarded Defendant $141,097.99 in attorney fees pursuant to Paragraph 33 of the Contract.

Plaintiff moved for a new trial and Defendant moved for additional attorney fees. The trial court denied Plaintiff's motion and entered an amended judgment granting Defendant the additional attorney fees, for a total amount of $190,383.19 in fees. This appeal followed.

### Standard of Review

Plaintiff's first point on appeal relates to the trial court's decision to strike the testimony of Plaintiff's retained expert, which we review for an abuse of discretion. *Kivland v. Columbia Orthopaedic Group, LLP*, 331 S.W.3d 299, 311 (Mo. banc 2011). A trial court abuses its discretion when its "ruling is clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration." *Blake v. Irwin*, 913 S.W.2d 923, 931 (Mo. App. W.D. 1996). No abuse of discretion occurs where "reasonable persons can differ about the propriety of the action taken by the trial court . . . ." *Id.* When reviewing the trial court's decision regarding issues arising from pre-trial discovery, of which appellate courts grant trial court decisions great deference, "[w]e

9

look only for an abuse of this broad discretion which results in prejudice or unfair surprise." *Day Advertising Inc. v. Devries & Assocs.*, 217 S.W.3d 362, 366 (Mo. App. W.D. 2007) (citation and quotations omitted); *Ellis v. Union Elec. Co.*, 729 S.W.2d 71, 74 (Mo. App. E.D. 1987).

Plaintiff's remaining points allege that the trial court's amended judgment misapplies the law or is against the manifest weight of the evidence. In a court-tried case, "we will affirm the circuit court's judgment unless there is no substantial evidence to support it, it misstates or misapplies the law, or it goes against the weight of the evidence." *Brooke Drywall v. Building Constr. Enterprises, Inc.*, 361 S.W.3d 22, 26 (Mo. App. W.D. 2010) (citation and quotations omitted). "The trial court's judgment is presumed valid, [and] the burden is on the appellant to demonstrate its incorrectness[.]" *Harness v. Wallace*, 167 S.W.3d 288, 289 (Mo. App. S.D. 2005). Even if we find error, we cannot reverse the judgment unless we determine that the error "materially affect[ed] the merits of the action." Rule 84.13(b).

"Substantial evidence is evidence which has probative force and from which the trier of fact could reasonably find the issues in harmony with its decision." *Grider v. Tingle*, 325 S.W.3d 437, 440 (Mo. App. S.D. 2010). "[A]n against-the-weight-of-the-evidence challenge presupposes the threshold issue of the existence of substantial evidence supporting a proposition necessary to sustain a judgment, but, nevertheless, challenges the probative value of that evidence to induce belief in that proposition when viewed in the context of the entirety of the evidence before the trier of fact." *Houston v. Crider*, 317 S.W.3d 178, 186 (Mo. App. S.D. 2010). However, we defer to the trial

court's determination of the facts and matters of witness credibility, such that "[t]he evidence and all reasonable inferences drawn therefrom must be viewed in the light most favorable to the trial court's judgment, and all contrary evidence and inferences must be disregarded." *Wildflower Cmty. Ass'n, Inc. v. Rinderknecht*, 25 S.W.3d 530, 534 (Mo. App. W.D. 2000). A judgment should be set aside as "against the weight of the evidence" only with caution and only when the reviewing court has a firm belief that the judgment is wrong. *Houston*, 317 S.W.3d at 186.

To the extent Plaintiff's arguments require us to interpret the Subcontract, our review is de novo, as questions of contract interpretation are questions of law. *Wildflower Cmty. Ass'n, Inc.*, 25 S.W.3d at 534. When a contract is unambiguous, the parties' intent is determined based on the contract's language and parol evidence is not permitted. *Baker-Smith Sheet Metal, Inc. v. Building Erection Serv. Co.*, 49 S.W.3d 712, 716 (Mo. App. W.D. 2001).

## Discussion

At the outset, we note that many of Plaintiff's points relied on fail to comply with the briefing requirements set forth in Rule 84.04. Points II, III, IV, VI, and VII challenge the trial court's amended judgment with respect to Plaintiff's claims and Defendant's counterclaims as "against the manifest weight of the evidence and an improper application of the law." Challenging the substantial evidence to support the trial court's finding and the trial court's application of law identifies more than one ruling or action of the trial court. Additionally, Points III, V, and VII challenge multiple rulings of the trial court pertaining to different substantive matters: Point III combines challenges the trial

11

court's decision on Plaintiff's breach of contract claim and affirmative defense of waiver; Point V addresses Defendant's counterclaims for breach of contract, breach of warranty, and Plaintiff's affirmative defense of mitigation; and Point VII challenges both the award of damages and attorney fees.

Therefore, Plaintiff's points relied on run afoul of Rule 84.04(d)(1)(A)'s requirement that a point "identify the trial court ruling or action that the appellant challenges[.]" Inadequate briefs are a disservice to the parties and a burden on the justice system. *Thummel v. King*, 570 S.W.2d 679, 686 (Mo. banc 1978). However, given the result we reach in this case, suspension of Rule 84.04's application will result in no hardship to Defendant. Accordingly, and because we are able to discern the basic contentions of Plaintiff's points relied on, we exercise our discretion to review Plaintiff's claims. *See Reynolds v. Brill*, 302 S.W.3d 716, 718-19 & n.3 (Mo. App. S.D. 2010).

### Point I: Motion to Strike Retained Expert

In its first point relied on, Plaintiff asserts that the trial court abused its discretion by barring the testimony of its retained expert witness because the expert was timely disclosed five weeks before trial, the parties had waived the scheduling order's deadlines, and Defendant had already commenced deposition of the expert.[7] Therefore, Plaintiff contends that admission of the expert's testimony would not have prejudiced Defendant, while exclusion of the expert affected the merits of the case and prejudiced Plaintiff. In response, Defendant asserts that the trial court did not abuse its discretion by striking the

---

[7] A "retained expert" is an individual who has no knowledge of the case or facts in controversy before being retained and is engaged by a party in anticipation of litigation to testify to scientific or other technical matters. *See Kehr v. Knapp*, 136 S.W.3d 118, 123 (Mo. App. E.D. 2004).

witness because Plaintiff failed to timely designate the witness by naming the retained expert nine months after the court-ordered deadline and just five weeks before trial.

"Missouri caselaw has consistently held that courts have broad discretion to strike expert witnesses who are not timely filed." *Legg v. Certain Underwriters at Lloyd's of London*, 18 S.W.3d 379, 386 (Mo. App. W.D. 1999). This discretion should be aimed toward achieving fundamental fairness and avoiding unfair disadvantage. *Ellis*, 729 S.W.2d at 76. "[U]ntimely disclosure of an expert witness' identity is so offensive to the underlying purposes of the discovery rules that prejudice may be inferred." *Alberswerth v. Alberswerth*, 184 S.W.3d 81, 101 (Mo. App. W.D. 2006) (citation and quotations omitted). Exclusion of expert testimony that was untimely disclosed does not constitute reversible error unless the testimony would have changed the outcome of the case. *Legg*, 18 S.W.3d at 386.

Here, the record reflects that Plaintiff, pursuant to the scheduling order, was required to name any retained experts by July 1, 2011, which was five months and five days before the original December 5, 2011 trial date. Plaintiff did not name any retained experts in its initial answer to Defendant's request for interrogatories. On September 27, 2011, Plaintiff moved for a continuance of the trial date indicating that written discovery had not been completed, as Plaintiff had allegedly not received complete written discovery from Defendant, and that oral discovery was yet to ensue, despite the scheduling order's October 1, 2011 deadline for completion of all discovery. Although Defendant did not agree to the continuance, the trial court granted Plaintiff's motion and reset the trial date for February 27, 2012. About a month before trial, on January 19,

2012, Plaintiff moved for another continuance, noting that although "the parties have been diligent in taking discovery" and that written discovery had been completed, Plaintiff still needed to take the depositions of multiple witnesses. Defendant did not agree to the continuance, but the trial court granted Plaintiff's motion and reset trial for April 30, 2012, indicating that Plaintiff needed to take additional depositions.

Five weeks before the trial date, Plaintiff filed an amended answer to Defendant's request for interrogatories designating, for the first time, Doctor Kent Johnson, P.E.,[8] as a retained expert. Plaintiff's amended answer indicated that Johnson would testify about the "characteristics and welding of the steel in the penstock and the materials installed on the penstock," and generally about "industry standards relating to time and materials contracts as well as the dissemination of information required to perform under such contracts." Defendant moved to strike Plaintiff's designation of the retained expert and to prohibit Johnson from testifying at trial. The trial court granted Defendant's motion, finding that undue prejudice would result to Defendant to allow Plaintiff to designate a retained expert at this "very late date" and that it would be "unfair" to address such prejudice by granting another continuance.

Contrary to Plaintiff's position, Plaintiff did not timely disclose Johnson as a retained expert. The original scheduling order required designation of Plaintiff's retained experts by July 1, 2011, more than five months before the original trial date. Plaintiff did not designate a retained expert by that deadline. Instead, while the lawsuit remained pending for nearly a year and a half, Plaintiff did not designate a retained expert until just

---

[8] P.E. means "professional engineer."

14

five weeks before trial, at which time the scheduling order precluded Defendant from obtaining its own retained expert witness. Under the circumstances, the disclosure was untimely. *See Wilkerson v. Prelutsky*, 943 S.W.2d 643, 649 (Mo. banc 1997) (failure to disclose expert witness until a "few weeks" before trial untimely when opposing party was subject to order prohibiting it from retaining new experts).[9] Because Plaintiff had the responsibility to timely disclose any retained experts it intended to call at trial, but did not do so, the record reflects that Plaintiff abused the discovery process. *See Goede v. Aerojet Gen. Corp.*, 143 S.W.3d 14, 23-4 (Mo. App. E.D. 2004) (failure to timely disclose witness was an abuse of discovery procedures).

Notwithstanding its clear violation of the scheduling order's deadline for disclosing retained expert witnesses, Plaintiff asserts that because neither party complied with the scheduling order that the deadlines were waived and that Plaintiff's disclosure of Johnson was, therefore, timely.[10] First, even assuming that Defendant contributed to some delay, such noncompliance with the scheduling order's October 2011 discovery

---

[9] Plaintiff supports its position that it made a timely disclosure by comparing the five weeks between its disclosure and trial with numerous cases in which the disclosure was closer to the trial date and deemed untimely. *See Missouri Bd. of Nursing Home Administrators v. Stephens*, 106 S.W.3d 524, 526-29 (Mo. App. W.D. 2003) (untimely disclosure nine days before trial); *Legg*, 18 S.W.3d at 386 (untimely disclosure 19 days before trial); *State, ex. rel., Missouri Highway & Transp. Comm'n v. Meramec Valley Elevator, Inc*., 782 S.W.2d 642, 644-45 (Mo. App. E.D. 1989) (untimely disclosure one day before trial). However, the number of days between the disclosure of a witness and trial is not dispositive with respect to whether the disclosure was timely. As this Court has previously noted, "The infinite variety of situations which develop in pre-trial discovery renders impossible the adoption of a hard, fast rule designating exact and inflexible time limitations for disclosure of witnesses. For this reason the requirement of 'seasonable' disclosure is not defined, but is left to the exercise of sound discretion in each case." *Ellis*, 729 S.W.2d at 75-6.

[10] In support of this argument, Plaintiff also asserts that Defendant engaged in equally objectionable conduct by supplementing its expert disclosures six weeks before trial. However, Defendant's supplemental answer to Plaintiff's first set of interrogatories is not part of the record on appeal. Accordingly, because it is the appellant's duty to prepare the record on appeal, we will not construe the record favorably to Plaintiff. *See Wilkerson*, 943 S.W.2d at 649. Nonetheless, we note that the scheduling order did not designate any deadline for disclosing non-retained experts and Defendant's supplemental answer pertained to Defendant's non-retained expert.

15

deadline does not unequivocally constitute a waiver of the deadlines for disclosing retained experts. *See Acetylene Gas Co. v. Oliver*, 939 S.W.2d 404, 409 (Mo. App. E.D. 1996) ("A waiver is the intentional relinquishment of a known right" and waiver by conduct requires that no other reasonable explanation of the conduct is possible). Second, the fact remains that the original scheduling order required disclosure of Plaintiff's retained experts more than *five months* before trial, but Plaintiff named Johnson on March 26, 2012, just *five weeks* before the ultimate trial date. Thus, even assuming that the continuances extended the other deadlines in the scheduling order, Plaintiff's disclosure of retained experts would still have been due five months and five days before trial. The record simply does not support Plaintiff's contention that the disclosure was timely.

Plaintiff also asserts that no prejudice would result from allowing Johnson's testimony because Defendant was not surprised by the untimely disclosure and Defendant was able to adequately prepare for Johnson's testimony. However, with only five weeks remaining before trial, it was not unreasonable for the trial court to conclude that unfair prejudice would result to Defendant, in that Defendant would have no realistic opportunity to review the documents Johnson relied on, depose Johnson, and, if necessary, retain and prepare an expert witness of its own to rebut Johnson's testimony. In concluding that Johnson's testimony be excluded, the trial court implicitly found that, absent another continuance of the trial date, Defendant's ability to adequately prepare for Johnson's testimony, given the complex matters involved in this case, would be compromised. Moreover, "[t]he purpose of discovery is not merely to prevent surprise at

16

trial. An equally important purpose is to narrow the issues and thereby facilitate a speedy and less expensive disposition of the case." *Wilkerson*, 943 S.W.2d at 649. Had Plaintiff been allowed to present Johnson's testimony, Defendant would undoubtedly have suffered an unfair disadvantage, as well as undue delay and unnecessary expense.

Finally, despite Plaintiff's assertion to the contrary, we fail to see how the prejudice that Defendant would have sustained is outweighed by any potential prejudice to Plaintiff. This is because the testimony's exclusion did not materially affect the outcome of the case, given that Johnson's proposed testimony was either inadmissible or cumulative of evidence presented at trial.[11] We therefore cannot conclude that striking the untimely disclosed expert's testimony constituted reversible error. *See Legg*, 18 S.W.3d at 386.

Given the foregoing, we perceive no fundamental unfairness in the trial court's decision to strike Johnson's testimony where Plaintiff's disclosure was untimely, Defendant would have suffered unfair disadvantage, delay, and expense, and admission of Johnson's testimony would not have changed the outcome of the case. The trial court did not abuse its discretion by sustaining Defendant's motion to strike Johnson's

---

[11] Plaintiff cites to eight opinions of Johnson's deposition testimony, which it alleges were essential to its case. However, six of these statements are inadmissible legal conclusions, *e.g.*, statements pertaining to the interpretation of the Subcontract or Defendant's legal duty. *See State v. Cochran*, 365 S.W.3d 628, 634 (Mo. App. W.D. 2012) ("An expert may not substitute his . . . conclusions for the . . . conclusions of the jury upon the issue, or issues, before the triers of fact." (citation and quotations omitted)). The remaining statements—that Ameren's engineer failed to call attention to the fact that the lower portion of the penstock was composed of T-1 steel and that Plaintiff reasonably believed that the entire penstock was composed of the same type of steel given that the materials provided were carbon steel—were established through other evidence. Finally, we note that Johnson's deposition is not part of the record on appeal and we have merely considered Plaintiff's argument *ex gratia*. Because it is the appellant's duty to prepare the record for appeal, Rule 81.12, we cannot presume that Johnson's testimony would have affected the trial's outcome as such a conclusion would be pure speculation.

testimony on the basis that Plaintiff untimely designated its retained expert.  Point I is denied.

## *Point II: Account Stated*

In its second point relied on, Plaintiff asserts that the trial court's amended judgment against Plaintiff on its account stated claim is against the "manifest weight of the evidence and a misapplication of the law" because Defendant acknowledged the account since it did not dispute Plaintiff's invoices and admitted that it owed Plaintiff compensation for work performed.  In support, Plaintiff likens the present case to *Chisler v. Staats*, 502 S.W.2d 424 (Mo. App. 1973), where the defendant did not object to invoices for work completed and this Court held that the evidence established an account stated.  Defendant responds that Plaintiff did not plead or prove an action for account stated.

"An account stated is an agreement between parties, having had previous financial transactions, that a balance struck is correct and due between them, and a promise by the debtor, either express or implied, to pay the balance."  *Grant Selsor & Sons Lumber Co. v. Wood*, 872 S.W.2d 150, 153 (Mo. App. S.D. 1992).  To establish a claim for account stated, the claimant must establish that "(1) the parties had prior financial dealings, an open account; (2) the parties reached an agreement as to the amount due and owing on that account; and (3) the debtor acknowledged this obligation and made an unconditional promise to pay."  *Id*.  "In the absence of an express promise to pay, the retention of the account rendered for a reasonable time without objection admits to the account and

18

implies a promise to pay." *Interstate Distrib. v. Freeman*, 904 S.W.2d 481, 483 (Mo. App. S.D. 1995).

In the instant matter, the trial court found that Plaintiff did not prove that: (1) "the parties reached an agreement that [Defendant] owed [Plaintiff] any of the money claimed by [Plaintiff] as owed" and (2) "that [Defendant] acknowledged an obligation to [Plaintiff] in the amounts [Plaintiff] claims or that it made an unconditional promise to pay [Plaintiff]." Accordingly, the trial court ruled in favor of Defendant on Plaintiff's account stated claim.

On appeal, Plaintiff relies primarily on the testimony of Kris Kestner, Defendant's senior project manager responsible for oversight of the project. Kestner, however, never testified that Defendant and Plaintiff reached an agreement as to the amount Plaintiff claimed it was owed or that Defendant promised to pay Plaintiff that amount. Kestner merely explained that Defendant submitted to Ameren, on Plaintiff's behalf, a claim reflecting the time and materials Plaintiff expended in completing the repair and rework and, that once Ameren rejected the claim, Defendant concluded that Plaintiff was not entitled to remuneration. Kestner made clear that Defendant's initial belief that Plaintiff was owed compensation for the repair and rework, and never disputed Plaintiff's related invoices, was due to the fact that Defendant "took [Plaintiff] fully at [its] position that there was nothing wrong with [Plaintiff's] work." In short, Kestner's testimony does not provide evidence of an agreement between the parties that a balance is due or that Defendant promised to pay that amount, both of which are required to establish a claim for account stated. *See Grant Selsor & Sons Lumber Co.*, 872 S.W.2d at 153. Rather, the

thrust of Kestner's testimony is that Defendant's obligation to pay Plaintiff was contingent on the successful resolution of the Ameren claim.

Plaintiff, however, asserts that Defendant acknowledged the account since Defendant did not dispute Plaintiff's invoices and admitted that it owed Plaintiff compensation for work performed. Kestner *did* testify that Defendant did not dispute the invoices Plaintiff submitted to Defendant, that some invoices remained unpaid, and that Defendant never indicated in correspondence that it would not pay Plaintiff. Plaintiff, however, infers too much from this testimony and reads Kestner's statements in isolation. When viewed as a whole and in context, Kestner's testimony simply indicates that Defendant did not dispute the content of the invoices, *i.e.*, that these invoices correctly reflected the costs Plaintiff incurred executing the repair and rework and that these invoices remained unpaid because Defendant had submitted a claim to Ameren for payment. Further, Defendant's failure to expressly disagree with the amount allegedly owed in correspondence with Plaintiff, was not an implied promise to pay Plaintiff for the repair and rework, but was consistent with Defendant's acknowledgment that Plaintiff would be paid *if* Defendant prevailed on the claim against Ameren. Indeed, the emails between Plaintiff and Defendant's representatives that Plaintiff cites in support of its account stated claim reflect this same understanding.[12]

Therefore, this case is unlike *Chisler*, on which Plaintiff relies, because there the defendant reassured the plaintiff in writing that the balance of an unpaid invoice would be

---

[12] These emails indicate Defendant's acknowledgement that some invoices had been unpaid and forwarded to Defendant's accounting department for processing with the understanding that Plaintiff would be paid only if Ameren reimbursed Defendant.

paid. 502 S.W.2d at 426-27. No such reassurance occurred in this case. Contrary to Plaintiff's position, the trial court did not "disregard" the evidence supporting an account stated claim. Rather, the evidence that Plaintiff relies on does not support such a claim and, therefore, does not instill in this Court a firm belief that the trial court's judgment is wrong. *See Houston*, 317 S.W.3d at 186. Accordingly, the trial court's amended judgment against Plaintiff on its account stated claim is not against the weight of the evidence. Point II is denied.

### *Point III: Breach of Contract and Waiver*

In its third point relied on, Plaintiff asserts that the trial court's amended judgment against Plaintiff on its breach of contract claim is "against the manifest weight of the evidence and a misapplication of the law" because the evidence established that it performed its work in a "good and workmanlike" manner and, even assuming *arguendo* that it had not, Defendant accepted Plaintiff's work, thereby waiving its right to assert otherwise. In response, Defendant argues that the trial court's judgment against Plaintiff on its breach of contract claim is supported by substantial evidence on the record. Because this point is multifarious, we address each claim separately.

### 1. Breach of Contract

To establish a claim for breach of contract, the party asserting the claim must establish the existence of a contract, the rights and obligations imposed by the contract, a breach, and damages. *Hanna v. Darr*, 154 S.W.3d 2, 5 (Mo. App. E.D. 2004). "In the context of construction contracts . . . proof of breach requires proof that payment was not made for work performed in a good and workmanlike manner." *See R.K. Matthews Inv.,*

21

*Inc. v. Beulah Mae Housing, LLC*, 379 S.W.3d 890, 897 (Mo. App. W.D. 2012). Workmanlike in this context is defined as "work which is completed in a skillful manner and is non-defective." *Evans v. Werle*, 31 S.W.3d 489, 491 (Mo. App. W.D. 2000) (citation omitted). The burden of proof rests with the party claiming breach of contract. *R.K. Matthews Inv., Inc.*, 379 S.W.3d at 897.

In this matter, Plaintiff's breach of contract theory was that it fully and satisfactorily performed its obligations under the Subcontract and that Defendant failed to remit amounts due. In considering Plaintiff's claim, the trial court found that: (1) Plaintiff was responsible under the terms of the Subcontract for preparing a welding procedure; (2) Plaintiff did not identify the type of steel in the lower portion of the penstock and did not submit a new welding procedure for welding to T-1 steel before beginning its work on that portion of the penstock; and (3) Plaintiff's welding of the drain access collars caused the penstock to crack. Accordingly, the trial court concluded that Plaintiff failed to meet its burden of proof to establish that "the work it seeks payment for was performed in a good and workmanlike manner" and further concluded that Defendant was not obligated to pay Plaintiff for defective work.

At trial, several of Plaintiff's and Defendant's witnesses testified that Plaintiff did not determine the type of steel located in the lower portion of the penstock before beginning its work there and that Plaintiff's welding procedure used at that location was defective and caused the penstock to crack. Sopata, Plaintiff's superintendent on the project, testified that Plaintiff would typically "find out what [we were] welding on first," but that Plaintiff did not follow this process and only discovered that the lower portion of

22

the penstock was composed of T-1 steel after numerous defective welds had been completed. Steve Weber, Plaintiff's first superintendent on the project, similarly testified that Plaintiff typically informs its "quality control man . . . what the steel is," *i.e.*, both the base metal and material to be welded, and that he did not know what information was given to Plaintiff's quality control consultant. Carl Davis, Plaintiff's quality control consultant who submitted Plaintiff's welding procedures for the drain access collars, testified that he never saw or asked for the drawings or specifications for the project and that, in hindsight, the welding procedures he submitted and that Plaintiff used were not appropriate for welding A572 carbon steel to T-1 steel and would cause the penstock to crack. James Briem, Defendant's metallurgical expert, explained that the cracking in the penstock was caused by Plaintiff's improper welding process, which applied too much heat to the T-1 steel embrittling it and causing it to crack. Briem Engineering's final report was also admitted into evidence and reflected its conclusion that the "excess weld shrinkage" of Plaintiff's weldments caused the penstock to crack. Given the foregoing, we agree with Defendant that the trial court's conclusion, that Plaintiff failed to establish that it performed its obligations in a workmanlike manner, is supported by substantial evidence.

Notwithstanding the substantial evidence supporting the trial court's conclusion, Plaintiff challenges the probative value of that evidence by referencing two pieces of evidence that allegedly indicate that its welds were not defective: (1) the claim for payment that Defendant submitted to Ameren, as well as (2) Kestner's testimony that the

23

"metal surrounding the welds" failed.[13]  The claim for payment, however, does not support a conclusion that Plaintiff satisfactorily performed under the Subcontract. Defendant submitted the claim to Ameren based on its good faith belief that Plaintiff's assertions—that the penstock caused the cracking, not Plaintiff's weldments—were true in order to assist Plaintiff in its effort to obtain payment for the repair and rework.  Later, after Ameren denied the claim, Defendant realized that Plaintiff's claim was not scientifically supportable.  As to Kestner's statement, Plaintiff again reads his testimony in isolation and mischaracterizes his explanation of the damage caused by Plaintiff's welds as an assertion that Plaintiff successfully completed the welds.  However, when Kestner's testimony is read as a whole, it is clear that he was explaining the damage Defendant perceived at the time of its discovery.  Plaintiff has not, as our review of the record confirms, identified evidence that its welding procedure was non-defective sufficient to challenge the probative value of the evidence supporting the trial court's conclusion.  *See Houston*, 317 S.W.3d at 187.  Accordingly, Plaintiff has failed to demonstrate that the trial court's conclusion, that Plaintiff failed to perform its work in a workmanlike manner, is against the weight of the evidence.

## 2. Waiver

In the alternative, Plaintiff contends that even if its work was defective, Defendant accepted the welding and, thus, waived its right to complain of the defects.  Defendant

---

[13] Plaintiff also says that no evidence supported a causal connection between Plaintiff's alleged failure to perform its work in a workmanlike manner and the cracks in the penstock.  This argument is not encompassed by the point relied on and is therefore abandoned.  *See* Rule 84.04(e).

responds that the evidence was "undisputed that everyone involved" knew the cracks were a defect that had to be repaired.

In the context of a construction contract, waiver is an affirmative defense that may excuse a contractor's breach if the owner accepts the defective work. *See Leonards v. U-Jin Enterprises, Inc.*, 811 S.W.2d 480, 485 (Mo. App. S.D. 1991); *Forsythe v. Starnes*, 554 S.W.2d 100, 109 (Mo. App. 1977). "A waiver of defects in construction can occur when there is knowledge [of the defect] and acquiescence." *Leonards*, 811 S.W.2d at 485. To establish waiver, Plaintiff must show that Defendant intentionally relinquished a known contractual right—here, the right to work free from defects. *See Matt Miller Co. v. Taylor-Martin Holdings, LLC*, 393 S.W.3d 68, 79 (Mo. App. S.D. 2012). "If waiver is implied from conduct, the conduct must clearly and unequivocally show a purpose to relinquish the right." *O'Connell v. School Dist. of Springfield R-12*, 830 S.W.2d 410, 417 (Mo. banc 1992).

At trial, witnesses for both Plaintiff and Defendant agreed that, once the cracking was discovered around June 25, 2009, that work was continued for about a week because the parties believed the cracking was isolated. Once the parties discovered the cracking was widespread, Defendant directed Plaintiff to stop welding and to develop a new welding method, which was tested on a single drain access collar. This method failed and Plaintiff made another attempt. When Plaintiff discovered cracks again after its second attempt, further attempts at rewelding were stopped and Defendant hired Briem Engineering to develop a successful method. In its amended judgment, the trial court implicitly concluded that Plaintiff's affirmative defense of waiver failed when it found

25

that Defendant "stopped [Plaintiff's] work when it became apparent that [Plaintiff's] work caused the cracks," and that Defendant "did not accept this work without complaint . . . ."

Contrary to the trial court's findings, Plaintiff asserts that Defendant waived its right to complain of Plaintiff's defective performance because Defendant initially directed Plaintiff to continue using the original welding procedure and Defendant, after the project was complete, represented to Ameren that Plaintiff's work did not cause the cracking. These facts, while true, do not establish that Defendant waived its contractual rights because this evidence does not show that Defendant knowingly accepted Plaintiff's defective work. *See Leonards*, 811 S.W.2d at 485. That Defendant did not initially cease further welding when the first cracks were discovered was due to the fact that the parties believed the cracking to be isolated to a single access collar. Further, that Defendant represented to Ameren that Plaintiff's work was not defective was due to Defendant's good-faith belief that Plaintiff's assertions were true and to Defendant's obligation to seek payment from Ameren for Plaintiff's work. Plaintiff, therefore, has not identified any evidence to instill in this Court a firm belief that the trial court's determination was wrong as to justify reversal. *See Houston*, 317 S.W.3d at 186. Instead, having reviewed the record, it is clear that substantial evidence supports the trial court's conclusion and Plaintiff has failed to demonstrate why that evidence is lacking probative value.

In sum, substantial evidence supports the trial court's conclusion that Plaintiff did not perform its obligations under the Subcontract in a "workmanlike manner" and that Defendant did not accept Plaintiff's defective performance. Plaintiff has not established

26

that these conclusions are against the weight of the evidence. Accordingly, the trial court did not err by entering judgment against Plaintiff on its breach of contract claim. Point III is denied.

### Point IV: Pay-If-Paid Clause

In its fourth point relied on, Plaintiff asserts that the trial court's amended judgment for Defendant on its breach of contract counterclaim is "an improper application of the law" because the Subcontract's pay-if-paid clause is inapplicable. Plaintiff asserts that the clause is ambiguous, similar to the one in *Meco Systems, Inc. v. Dancing Bear Entertainment, Inc.*, 42 S.W.3d 794 (Mo. App. S.D. 2001), and therefore the trial court erred by construing it as creating a condition precedent to Defendant's obligation to pay Plaintiff.

Because Point III is dispositive as to this claim, we need not consider the merits of this argument. As explained, Plaintiff's breach of contract claim fails because it did not perform its work satisfactorily under the Subcontract. It follows that Plaintiff is not entitled to payment for the repair and rework and the pay-if-paid clause is not implicated. Therefore, the legal question whether the pay-if-paid clause is inapplicable due to a supposed ambiguity is moot. Point IV is denied.

### Point V: Counterclaim for Breach of Contract and Breach of Warranty, Mitigation

In its fifth point relied on, Plaintiff asserts that the trial court's amended judgment for Defendant on its breach of contract counterclaim is "against the manifest weight of the evidence and a misapplication of the law" because Plaintiff performed its obligations in a workmanlike manner and because Defendant failed to perform its obligations under

27

the Subcontract. Plaintiff further asserts that the warranty provision did not apply and that Defendant failed to mitigate its damages. In response, Defendant argues that the trial court's judgment in Defendant's favor on its breach of contract counterclaim is supported by substantial evidence on the record. Defendant further contends that it timely asserted its warranty claim and that the evidence does not support Plaintiff's assertion that Defendant did not mitigate its damages. Because this point is multifarious, we address each claim separately.

### 1. Counterclaim for Breach of Contract

Defendant's breach of contract theory was that Plaintiff breached the Subcontract by failing to perform its work in a workmanlike manner and, more generally, by failing to investigate and select appropriate welding procedures as Part II(H) paragraphs 30 and 32 of the Subcontract required. As a counterclaimant, Defendant affirmatively asserted a claim for a relief and the burden therefore shifted to Defendant to prove both the poor quality of Plaintiff's work and the damage incurred as a result. *See R.K. Matthews Inv., Inc.*, 379 S.W.3d at 897. In concluding that Defendant satisfied its burden, the trial court found, in relevant part, that: (1) Plaintiff's welding that caused the penstock to crack was not performed in a workmanlike manner; (2) Plaintiff had a contractual obligation to review all "contract documents" and inform itself of all conditions before beginning its welding work; and (3) Plaintiff failed to inform itself about the conditions of the lower penstock before beginning its work at that location.

At the outset, we reject Plaintiff's assertion that because Plaintiff allegedly performed its work satisfactorily, that the trial court's amended judgment was erroneous.

28

We have already determined under Point III that the trial court did not err by concluding that Plaintiff failed to establish that it performed its obligations in a workmanlike manner. We also noted under Point III the substantial evidence supporting the trial court's conclusion that Plaintiff's performance was deficient. Accordingly, the trial court did not err by concluding that Defendant established that Plaintiff's work was not performed in a workmanlike manner.

Our conclusion in this regard, however, is not dispositive as to Defendant's breach of contract counterclaim because Plaintiff, relying on the first-to-breach rule, asserts that Defendant breached the Subcontract first and thereby hindered Plaintiff's performance. *See Williams Constr., Inc. v. Weher Constr. LLC*, 403 S.W.3d 660, 664 (Mo. App. S.D. 2012) ("[A] party to a contract cannot claim its benefit where he is the first to violate it." (citation and quotations omitted)). Specifically, Plaintiff explains that the Subcontract obligated Defendant to provide Plaintiff with "contract documents" pertaining to the specifications of the penstock, which Defendant allegedly failed to do.[14]

Regarding the obligation to provide "contract documents," the Subcontract's opening paragraph states:

> In accordance with this Agreement, the Agreement between [Ameren] and [Defendant], and in accordance with the General Conditions of the Contract, Supplementary General Conditions, Special Conditions, the Drawings and Specifications and addenda as listed in Attachment "A" prepared by the Architect, or [Ameren's] authorized agent, all of which documents form a part of the Contract between the [Defendant] and [Ameren] and hereby become a part of this Contract, and which herein referred to as the Contract Documents, and *shall be made available to the*

---

[14] Plaintiff does not cite any specific provision of the Subcontract in support of its argument.

*Subcontractor upon his request* prior to and at anytime [sic] subsequent to signing this Subcontract. (Emphasis added.)

The final clause of this paragraph expressly states that contract documents "shall be made available to the Subcontractor upon his request," meaning that it was ultimately Plaintiff's responsibility to request any of the contract documents that it wished to review. The implication of this language is that Defendant's obligation to provide the contract documents was entirely contingent upon Plaintiff's request for contract documents, and that in the absence of such a request, Defendant had no obligation to provide them. Because Defendant was not obligated to provide the contract documents in the absence of a request from Plaintiff, the contractual obligation that Plaintiff alleges Defendant breached does not exist.[15] Defendant's alleged failure to provide the documents did not constitute a breach of the Subcontract. Consequently, the first-to-breach rule has no applicability to the facts of this case.[16]

Nonetheless, Plaintiff asserts that ambiguities exist in the Subcontract's identification of the "contract documents," meaning that Plaintiff should have been entitled to rely solely on the information it received from Defendant and also that Defendant failed to prove that Plaintiff should have known of the penstock's composition. In other words, this ambiguity, according to Plaintiff, nullifies Plaintiff's obligations under paragraphs 30 and 32 of Part II(H) of the Subcontract, which required

---

[15] Notably, Plaintiff does not allege that it requested the documents but did not receive them.

[16] Plaintiff also asserts that the trial court's finding that the Subcontract obligated Plaintiff to inform itself of the T-1 steel in the penstock is contrary to Defendant's obligation to provide the contract documents. Given that Defendant had no obligation to provide the contract documents in the absence of a request, no such conflict exists.

Plaintiff to personally investigate conditions affecting the penstock and to independently verify field construction criteria.

As noted, the Subcontract's opening paragraph clearly delineates the "contract documents." Plaintiff's argument that the Subcontract is ambiguous is, therefore, belied by the Subcontract's evident clarity. Accordingly, we will not construe the Subcontract against Defendant as to relieve Plaintiff of its duties under the Subcontract to request the contract documents, to personally investigate and inform itself of conditions affecting its work on the penstock, and to independently determine and verify the construction criteria required to complete its work. Plaintiff's argument is merely an attempt to avoid its contractual obligations. The trial court did not err by ruling in Defendant's favor on its breach of contract counterclaim.

## 2. Counterclaim for Breach of Warranty

Next, Plaintiff claims that the Subcontract's warranty provision is inapplicable because Defendant failed to assert its counterclaim for breach of warranty within one year from the completion of Plaintiff's work.[17] Defendant argues that Plaintiff misconstrues the contractual language.

The warranty provision states in relevant part:

> [Plaintiff] warrants that the Work performed under the Contract will be free from defects in design, workmanship and materials, will be suitable for its intended purpose as specified in the Contract . . . . [Plaintiff] further warrants that the Work will comply with the specifications, drawings,

---

[17] In its reply brief, Plaintiff additionally argues for the first time on appeal that it complied with the warranty provision because it performed the repairs and replaced the defective work. However, this Court does "not review an assignment of error made for the first time in the reply brief." *Arch Ins. Co. v. Progressive Cas. Ins. Co.*, 294 S.W.3d 520, 524 n. 5 (Mo. App. W.D. 2009) (citation and quotations omitted).

samples and other descriptive information as furnished or specified in the Contract . . . .

If any of the Work does not comply with any of the warranties contained in this Section during the first year after [Defendant's] final acceptance of the Work, or longer if specified elsewhere, [Plaintiff] shall at its own expense promptly correct by repair or replacement any noncomplying work.

In considering Defendant's breach of warranty counterclaim, the trial court found that Plaintiff "expressly warranted its work against defects of design, workmanship and materials . . . ." It further concluded that Defendant established that "the work [Plaintiff] performed that caused cracks in the penstock [was not performed in a workmanlike manner] in breach of express contractual warranties . . . that [Plaintiff] would perform its work in a good and workmanlike manner."

As Plaintiff points out, the record reflects that Defendant asserted its breach of warranty counterclaim more than a year after Plaintiff completed its work. This fact, however, is immaterial because the warranty provision does not require Defendant to initiate a legal claim for breach of warranty within a year of Plaintiff's completion of the work. In arguing that the warranty clause establishes a deadline for filing a claim, Plaintiff simply misconstrues the contractual language. As Defendant explains, the warranty provision unambiguously indicates that Plaintiff breaches the warranty provision if Plaintiff's work fails to comply with its warranties within one year of the work's completion. Plaintiff breached the warranty provision well within this time frame, when the parties discovered the cracks in the penstock around the welds within days of their completion. Thereafter, Defendant invoked the warranty provision by

32

directing Plaintiff to remove and replace the defective work.[18] The trial court did not err by concluding that the warranty provision is applicable and by entering judgment for Defendant on its counterclaim for breach of warranty.

### 3. Mitigation of Damages

Plaintiff next asserts that the trial court ignored evidence that Defendant failed to mitigate its damages, which is an affirmative defense that defeats Defendant's counterclaims in their entirety. Defendant counters that it did not fail to mitigate damages.

Under the rule of mitigation of damages, "one damaged through alleged breach by another of some legal duty or obligation [has to] make reasonable efforts to minimize the resulting damage." *Cunningham v. Cunningham*, 805 S.W.2d 363, 365 (Mo. App. S.D. 1991) (quotations omitted). Thus, losses that could reasonably have been avoided are not recoverable. *Business Men's Assurance Co. of Am. v. Graham*, 891 S.W.2d 438, 448 (Mo. App. W.D. 1994). "The duty to mitigate damages, however, does not arise until the promisee learns that the contract has been breached." *A.G. Edwards & Sons v. Drew*, 978 S.W.2d 386, 391 (Mo. App. E.D. 1998).

The trial court did not expressly address Plaintiff's affirmative defense that Defendant failed to mitigate its damages. However, the trial court implicitly concluded that this defense failed when it found that Defendant "stopped [Plaintiff's] work when it

---

[18] Plaintiff also asserts that Defendant waived its warranty claim because Defendant allegedly paid Plaintiff for a portion of the defective work. However, other evidence on the record establishes that Defendant did not pay for any of the repair and rework and Plaintiff has not demonstrated why this evidence lacks probative value. We therefore defer to the trial court's determination. *Evans*, 31 S.W.3d at 491 ("The trial court was free to believe none, part or all of the testimony presented at trial" and matters of credibility and weight of the evidence are the province of the trial court).

became apparent that [Plaintiff's] work caused the cracks," and that Defendant "did not accept this work without complaint but instead immediately directed [Plaintiff] to begin repairing and removing the defective work."

We have already noted the evidence, under Point III, showing that Defendant acted promptly to cease further defective welding, worked with Plaintiff for a reasonable amount of time for it to develop a solution, and when Plaintiff could not do so, retained an outside consultant. Thus, the record refutes Plaintiff's assertion that Defendant "did nothing" and permitted Plaintiff to continue using a defective welding procedure through September 2009, thereby incurring unnecessary damages. Indeed, having reviewed the pertinent portions of the record that Plaintiff cites, it is evident that Plaintiff has simply mischaracterized the record to support its argument. Plaintiff has failed to sufficiently challenge the probative value of the substantial evidence supporting the trial court's conclusion to induce a firm belief in this Court that the trial court's judgment is wrong.[19] *See Houston*, 317 S.W.3d at 186. Substantial evidence supports the trial court's implicit conclusion that Defendant mitigated its damages to the extent reasonably possible and Plaintiff has failed to demonstrate that this conclusion is against the weight of the evidence.

To summarize, the trial court's ruling in favor of Defendant on its breach of contract counterclaim is not against the weight of the evidence, the trial court did not err by concluding that the warranty provision is applicable, and the trial court's conclusion

---

[19] In addition, Plaintiff again argues that Defendant's acceptance of Plaintiff's work constitutes a waiver of Defendant's breach of contract and warranty claims. However, we have already concluded that substantial evidence supports the trial court's conclusion that Defendant did not accept Plaintiff's work. *See supra*, point III.

34

that Defendant mitigated its damages is not against the weight of the evidence. Point V is denied.

## *Point VI: Counterclaim for Indemnification*

In its sixth point, Plaintiff asserts that the trial court's judgment for Defendant on its claim for indemnification is "against the manifest weight of the evidence and a misapplication of the law" because Defendant failed to establish it was entitled to indemnity under the Subcontract's indemnity provision. Plaintiff explains that the Subcontract's indemnity clause is limited to indemnity against liability and because Defendant did not claim that Defendant was liable to Ameren, the trial court erred by finding that Plaintiff had an obligation to indemnify Defendant. In response, Defendant argues that the Subcontract's indemnity provision is not limited to "liability to others."

Generally, there are two types of indemnity contracts: those that indemnify against liability and those that indemnify against loss. *Burns & McDonnell Engineering Co. v. Torson Constr. Co.*, 834 S.W.2d 755, 758 (Mo. App. W.D. 1992). Regarding indemnity against liability, such "[a] claim for indemnity is ripe for adjudication when the defendant has suffered a judgment and liability has attached." *Fast v. Marston*, 282 S.W.3d 346, 348 (Mo. banc 2009). "If the indemnity is against loss, the cause of action accrues when the indemnitee sustains actual loss." *Burns & McDonnell Engineering Co.*, 834 S.W.2d at 758. Some indemnity contracts are intermixed, providing for indemnification against both liability and loss. *Superintendent of Ins. v. Livestock Market*, 709 S.W.2d 897, 903 (Mo. App. W.D. 1986).

In the instant case, the indemnity provision required Plaintiff to "indemnify and hold harmless [Defendant] from and against any and *all loss*, claims, suits, causes of action, liability, damages, costs, [and/or] expenses . . . incurred by [Defendant] . . . as a result of . . . any work or operations under or in connection with this Subcontract." (Emphasis added). Based on this language, the trial court concluded that the Subcontract required Plaintiff to indemnify Defendant for Defendant's "costs and expenses arising out of [Plaintiff's] breach of the [Sub]contract" and that Plaintiff's "failure to indemnify [Defendant] for these costs is a breach of the Subcontract."

Looking to the contractual language, it is clear that the terms "loss" and "liability" refer to indemnification against both losses and liability. Thus, the indemnity provision required Plaintiff to indemnify Defendant for both actual losses and liabilities arising from Plaintiff's performance of the Subcontract. *See Burns & McDonnell Engineering Co.*, 834 S.W.2d at 758 (indemnity contract is mixed where it protected against "all claims . . . [and] losses."). In order to establish that Plaintiff breached the indemnity provision, Defendant had to show that it suffered a loss *or* incurred a liability as result of Plaintiff's performance in connection with the Subcontract. Under the plain terms of the Subcontract it is not necessary, as Plaintiff suggests, that Defendant exclusively establish that it suffered a "liability." Plaintiff misconstrues the contractual language.

The trial court did not err by concluding, consistent with the unambiguous contractual language, that the indemnity clause applied and required Plaintiff to indemnify Defendant for loss arising out of Plaintiff's breach of the Subcontract. Point VI is denied.

## Point VII: Damages and Attorney Fees

In its seventh point relied on, Plaintiff asserts that the trial court's amended judgment in Defendant's favor on Defendant's breach of contract counterclaim is "against the manifest weight of the evidence and a misapplication of the law" because Defendant failed to establish that it was entitled to damages and attorney fees. Specifically, Plaintiff claims that the trial court improperly awarded Defendant consequential damages and that the indemnity clause of the Subcontract, upon which Defendant claimed entitlement to attorney fees, does not afford Defendant such fees. Because this point is multifarious, we address each claim of error separately.

### 1. Damages

Regarding its claim that the trial court misapplied the law in awarding damages, Plaintiff asserts that the proper measure of damages was the cost of repair and that the trial court's award improperly awarded Defendant consequential damages. Defendant responds that that measure of damages is inapplicable because the present matter is not a "defective construction" case.

"The proper measure of damages is a question of law for determination by the trial court." *Business Men's Assurance Co.*, 891 S.W.2d at 449. The party claiming damages bears the burden to establish the existence and amount of damages within a reasonable degree of certainty. *Manors at Village Green Condo., Inc. v. Webb*, 341 S.W.3d 162, 164 (Mo. App. E.D. 2011). "The trial court's findings as to damages are entitled great weight and this Court will not disturb these findings unless the damages awarded are clearly wrong, could not have been reasonably determined, or were excessive." *Id*. at 165.

37

Here, the trial court awarded Defendant $220,093.80 in damages that Defendant incurred as a result of Plaintiff's breach of the Subcontract. The trial court determined that $94,599 of this amount reflected costs incurred for "support labor and remedial work" and that $125,494.80 of this amount reflected general conditions costs, including "project management time, forklifts, job trailer rental, trucks, fuel, amounts paid to Briem Engineering, testing costs for the rewelds, and other items."

Although the trial court's amended judgment does not expressly specify a measure of damages, it is clear that the trial court premised its award on the terms of the Subcontract. Specifically, in its conclusions of law, the trial court determined that the Subcontract required Plaintiff "to *indemnify* [Defendant] for its costs and expenses arising out of [Plaintiff's] breach of the contract[,]" and "to be responsible for all costs and expenses incurred [including Defendant's costs and expenses] in repairing the cracks it caused in the penstock." (Emphasis added). Indeed, the indemnity clause of the Subcontract expressly states that Plaintiff agrees to indemnify Defendant for "all loss, . . . damages, costs, [and] expenses" incurred as a result of Plaintiff's breach of the Subcontract. Thus, the trial court's damages award reflects those losses for which the parties expressly agreed Plaintiff would be liable in the event of Plaintiff's breach of the Subcontract. *See Kracman v. Ozark Electric Coop., Inc.*, 816 S.W.2d 688, 691 (Mo. App. S.D. 1991) (measure of damages for breach of an indemnity agreement against loss is actual amount of loss sustained or paid). Whether cost of repair as a measure of damages is applicable, then, is irrelevant. The damages awarded are not clearly improper

but are premised upon the parties' express agreement. Accordingly, we cannot conclude that the trial court erred in calculating Defendant's damages.

## 2. Attorney Fees

With respect to the award of attorney fees, Plaintiff asserts that the trial court erred by awarding attorney fees under paragraph 33 of the Contract because Defendant's pleadings did not request attorney fees under that provision, but rather asserted entitlement to attorney fees under the indemnity clause. Plaintiff again argues that the indemnity clause is inapplicable, and that even if Defendant had properly pleaded entitlement to attorney fees under paragraph 33, that that provision is inapplicable because the Subcontract is ambiguous. Defendant counters that it met the pleading requirements and that Plaintiff raised no objection to Defendant's request for fees under paragraph 33 of the Contract during trial.[20]

Missouri follows the "American Rule," meaning that each party generally pays for its own attorney fees. *Washington University v. Royal Crown Bottling Co.*, 801 S.W.2d 458, 468 (Mo. App. E.D. 1990). However, "[a]ttorney fees are recoverable in two situations: when a statute specifically authorizes recovery and when the contract provides for attorney fees." *Lucas Stucco & EIFS Design, LLC v. Landau*, 324 S.W.3d 444, 445 (Mo. banc 2010). Further, it is established that attorney fees are special damages that must be pleaded specifically. *Bailey v. Hawthorn Bank*, 382 S.W.3d 84, 107 (Mo. App. W.D. 2012); Rule 55.19. A plaintiff in a breach of contract case can recover special

---

[20] Defendant's argument implies that Plaintiff has waived this claim by failing to raise an objection in the trial court, but Defendant does not cite to the pertinent portion of the record establishing Plaintiff's alleged failure in this regard. Accordingly, we exercise our discretion to consider the merits of Plaintiff's argument as if it were properly preserved.

damages "if those special damages have been pleaded and made known to the person who breaches the contract." *Allen v. Foster*, 668 S.W.2d 277, 280 (Mo. App. S.D. 1984).

Here, each counterclaim of Defendant's answer pleaded entitlement to attorney fees and expenses under Part II(H), paragraph 17 of the Subcontract, *i.e.*, the indemnity clause. Each counterclaim was also followed by a prayer for relief specifically requesting "attorney fees and expenses." Attached to Defendant's answer was both the Subcontract and the Contract. Ultimately, the trial court's amended judgment awarded Defendant "reasonable attorney's fees" under paragraph 33 of the Contract.

That Defendant's answer did not specifically reference paragraph 33 of the Contract is immaterial because the facts pleaded and relief prayed sufficiently placed Plaintiff on notice that Defendant sought an award of attorney fees. *See Foster*, 668 S.W.2d at 280 (special damages recoverable if made known to breaching party); *cf. Lucas Stucco & EIFS Design*, 324 S.W.3d at 444 (pleading requirements satisfied where all elements of statutory claim pleaded and prayer for "reasonable attorneys' fees" was made). Plaintiff cites no authority indicating that the specific contractual provision, or provisions, entitling a litigant to attorney fees must be cited in the pleadings. Moreover, Plaintiff's allegation that the indemnity clause and paragraph 33 of the Contract create an ambiguity, such that paragraph 33 is inapplicable, is specious. The indemnity clause affords attorney fees in the event the indemnity clause is triggered, whereas paragraph 33 permits attorney fees in the event an attorney is hired to enforce any provision of the Subcontract. Paragraph 33 is consistent with, and merely supplements, the indemnity provision.

In sum, the trial court did not err by awarding Defendant damages or attorney fees. The damages award was contemplated by the Subcontract, as was the award of attorney fees. Point VII is denied.

## Conclusion

The amended judgment of the trial court is affirmed.

_____
Philip M. Hess, Judge

Lisa Van Amburg, P.J. and
Patricia L. Cohen., J. concur.